IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| JACOB O'BRYANT and MARK BRANDON BAKER, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>ABC PHONES OF NORTH CAROLINA, INC., d/b/a VICTRA, f/d/b/a A WIRELESS,<br><br>     Defendant. | No. 2:19-cv-02378 |

ORDER

This is an FLSA action.  Before the Court are five motions.
The first is a Joint Motion for Settlement Approval (the "Motion
for Settlement Approval"), brought by Plaintiffs Jacob O'Bryant
and Mark Baker (collectively, "Plaintiffs" or "Named
Plaintiffs") and Defendant ABC Phones of North Carolina, Inc.,
d/b/a VICTRA, f/d/b/a A Wireless ("VICTRA"), filed on September
9, 2019.[1]  (ECF No. 14.)  The second is putative intervenors Ron
Hardney, Manuel Panngasiri, Michelle Salway, and other named
persons' Motion to Intervene (the "Hardney Motion"), filed on

---

[1] For purposes of this Order, unless otherwise defined, the Court
adopts all defined terms set forth in the parties' proposed Settlement
Agreement (ECF No. 14-1).

September 27, 2019.  (ECF No. 15.)  The third is putative intervenor James Baggott's Motion to Intervene (the "Baggott Motion"), filed on February 24, 2020.  (ECF No. 39.)  The fourth is putative intervenors Priscilla Solorio and Mariano Diaz's Motion to Intervene (the "Solorio and Diaz Motion"), filed on July 1, 2020.  (ECF No. 57.)  The fifth is the parties' Joint Motion for Approval of First Amendment to Settlement and Release Agreement to Provide Further Benefits to the Store Manager and Non-Manager Classes.  (ECF No. 58.)

For the following reasons, the Motion for Settlement Approval and Motion for Approval of First Amendment to Settlement are DENIED.  The Hardney Motion, the Baggott Motion, and the Solorio and Diaz Motion are DENIED WITHOUT PREJUDICE.

## I.   Background

This dispute arises from VICTRA's alleged failure to pay overtime compensation to certain employees.  VICTRA sells Verizon-compatible phones, Verizon data plans, and cellular phone accessories through VICTRA-branded locations.  (ECF No. 12 ¶ 12.)  VICTRA sets wage and hour policies, including employees' overtime pay, commission pay, and overtime rates.  (Id. ¶ 15.)  VICTRA compensates its retail associates by paying an hourly rate plus bonuses and commissions, which are paid according to frequently adjusted formulas.  (Id. ¶ 16.)  The commission payments and/or non-discretionary bonuses are not included in

the employees' regular rate when overtime payments are calculated. (Id. ¶ 21.)

On June 10, 2019, Plaintiffs filed a Complaint in this action (the "Initial Complaint"). (ECF No. 1.) In their Initial Complaint, Plaintiffs, VICTRA retail sales associates employed on an hourly-plus-commission basis, alleged that VICTRA employed a uniform payment structure for its retail sales associates that violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq. (Id. ¶¶ 8, 9, 34-39.) Plaintiffs alleged that VICTRA's payment scheme calculated the amount of overtime due by using the employees' base hourly rate rather than the regular rate as defined by 29 C.F.R. § 778.114, which required including commission payments and non-discretionary bonuses when calculating overtime. (See id. ¶¶ 19-21.) The collective action description in the Initial Complaint was:

> All current and former retail employees of ABC Phones of North Carolina, Inc. or any of its subsidiaries doing business as VICTRA, who were paid an hourly wage plus commission, and who were employed in the United States at any time during the applicable limitations period covered by this Collective Action Complaint (i.e. two years for FLSA violations and, three years for willful FLSA violations) up to and including the date of final judgment in this matter, and who are Named Plaintiffs or elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. § 216(b).

(Id. ¶ 4.)

On September 9, 2019, Plaintiffs filed a First Amended Complaint (the "FAC").[2]  (ECF No. 12.)  In the FAC, Plaintiffs amended, inter alia, Baker's job description from "retail sales person" to "store manager." (Compare ECF No. 1 ¶ 9, with No. 12 ¶ 11.)  The FAC adds an additional collective description, stating a separate retail "manager[]" subcollective in addition to the Initial Complaint's retail "employee[]" collective:

> All current and former retail managers of ABC Phones of North Carolina, Inc. or any of its subsidiaries doing business as VICTRA, who were paid an hourly wage plus commission, and who were employed in the United States at any time during the applicable limitations period covered by this Collective Action Complaint (i.e. two years for FLSA violations and, three years for willful FLSA violations) up to and including the date of final judgment in this matter, and who are Named Plaintiffs or elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. § 216(b).

(See ECF No. 12 ¶ 4).  The FAC also alleges an additional violation of the FLSA:  VICTRA's failure to pay its retail managers for work performed "off-the-clock."  (Id. ¶¶ 23, 26-29.)  Plaintiffs allege that VICTRA "converted its salaried store managers to hourly paid employees but did not substantially alter the work that such store managers, including [] Baker, were required to perform outside of their shifts"; that "store managers were not told that they should or could clock-in to complete work performed off-premises"; that these tasks included

---

[2] The FAC was filed as a matter of right.  Fed. R. Civ. P. 15(a)(1). It is the operative complaint.

"participating in mandatory conference calls scheduled outside of manager's shifts; responding to employee calls after work, before work, and on days off; responding to employee text messages; routinely checking and responding to issues brought up in group.me[]"; and that these tasks were performed "in excess of an hour per week." (Id. ¶¶ 26-29.) The FAC alleges that Plaintiffs are aware of another putative collective action addressing the retail manager "off-the-clock" allegations:

> On May 20, 2019, Ron Hardney, Manuel Panngasiri and Michelle Salway initiated a lawsuit styled as a collective action against ABC Phones of North Carolina in the District of New Jersey, 3:19-cv-12722-BRM-ZNQ, which operates as Victra Wireless, alleging that VICTRA violated the FLSA by requiring suffering and permitting its hourly-paid managers to work off-the-clock ("the New Jersey Action"). The New Jersey Action does not allege that VICTRA violated the FLSA by miscalculating its commissioned employees Regular Rate when determining overtime pay. Upon information and belief, Hardney, Panngasiri and Salway's claims in the New Jersey Action are subject to individual arbitration.

(Id. ¶ 36.)

Also on September 9, 2019, the parties filed the Motion for Settlement Approval.[3] (ECF No. 14.) The parties ask the Court to approve their proposed Settlement Agreement, (ECF No. 14-1), and to dismiss this case with prejudice. (ECF No. 14 at 1.) The parties represent that, at a mediation on August 21, 2019 (the "Mediation"), they were able to settle the managers' "off-

---

[3] The parties have not filed any motions to conditionally certify a set of similarly situated plaintiffs or motions to authorize notice and send opt-in consent forms.

the-clock" claims.  (Id. at 3.)  The parties represent that in the weeks after the Mediation, they were able to reach an agreement to settle the retail employees' "payment scheme" violations.  (Id.)  In preparation for the Mediation, the parties represent that they "conducted informal discovery" that led to VICTRA's production of "over 400,000 payroll records containing 24 variables related to the Named Plaintiffs and putative class" and containing "hours and wage information spanning more than three years of pay periods, including regular hours and pay, overtime hours and pay, commissions and special incentive payments, extra unearned overtime payments, and other payroll components."  (Id. at 2.)

On July 3, 2020, the parties filed a joint motion for Approval of First Amendment to Settlement and Release Agreement to Provide Further Benefits to the Store Manager and Non-Manager Classes.  (ECF No. 58.)  The parties represent that they have amended the Settlement Agreement to add $190,888 to the Gross Settlement Amount to "address the time period that has elapsed since the Settlement Agreement was filed in September 2019." (Id. at 1.)  The parties also represent that they have amended the Settlement Agreement to "make[] clear that, consistent with California law, the Settlement Agreement does not intend to release any claims under the [California Private Attorneys

General Act of 2004, Cal. Lab. Code Sections 2698 – 2699.5 (the "PAGA")]." (Id. at 1-2.)

The relevant terms of the First Amended Settlement Agreement[4] are summarized as follows:

- Plaintiffs and Potential Opt-In Plaintiffs are current and former non-exempt employees of VICTRA who worked as store managers (the "Store Manager Class") and non-manager retail employees (the "Non-manager Class") who worked in any VICTRA-owned store in the United States at any time between June 10, 2016, and May 30, 2020. (ECF No. 14-1 ¶ 1.1.; ECF No. 58-1 at 2.)

- There are 779 individuals in the Store Manager Class. (ECF No. 58-1 at 2.)

- There are 17,284 individuals in the Non-Manager Class. (Id.)

- There are 3,011 individuals that overlap between both classes for certain periods of time. (Id.)

- The total settlement amount is $ $1,715,888 (the "Gross Settlement Amount"). (Id.)

- The Gross Settlement Amount, after payments of service awards of $10,000 to both O'Bryant and Baker, will be divided into two sub-funds: (1) $1,092,827 for the Store Manager Class (the "Manager Fund"); and (2) $603,061 for the Non-Manager Class (the "Non-Manager Fund") (collectively, the "Settlement Funds"). (ECF No. 14-1 ¶¶ 4.2, 5.3; ECF No. 58-1 at 3.)

  o The Gross Settlement Amount is allegedly attributable to 50% backpay and 50% liquidated damages. (ECF No. 14-1 ¶ 5.4.)

- Plaintiffs' counsel seeks an amount not to exceed $292,500 from the Manager Fund and $149,750 from the Non-Manager Fund for attorneys' fees and costs. (Id. ¶ 5.5.)

---

[4] The term "First Amended Settlement Agreement" refers to the Settlement Agreement with the amended terms provided in the First Amendment to Settlement and Release Agreement.

- Individual settlement payment amounts for Opt-In Plaintiffs will be calculated pursuant to a point-allocation formula based on their job positions and the number of weeks they worked during the relevant timeframe. (See id. ¶ 5.2(a)-(f).)

- The parties ask the Court to appoint a "Settlement Administrator" to "notify the Potential Opt-In Plaintiffs of [the Settlement Agreement], distribute settlement checks to all Potential Opt-In Plaintiffs, and revert to Victra any unclaimed funds as described in this Agreement." (Id. ¶ 3.1.)

  o The Settlement Administrator will be selected by VICTRA. (Id.)

  o VICTRA agrees to pay the expenses associated with the Settlement Administrator and those expenses will not affect the Gross Settlement Amount. (Id.)

- The Settlement Administrator will communicate with the parties, handle all the administrative inquires of the Opt-in Plaintiffs, and deal with specific supplemental legal obligations in executing and distributing the Settlement Funds. (See id. ¶¶ 3.2-3.6, 6.2-6.3.)

- The Settlement Administrator will prepare and send, from a list provided by VICTRA, each Potential Opt-In Plaintiff a "Notice of FLSA Settlement" form, (Id. at 24-26), along with a check for the amount of their individual settlement, calculated pursuant to the point-allocation formula, at least 30 days after the Court grants final settlement approval. (Id. ¶¶ 6.1, 6.3.)

  o The Notice of FLSA Settlement form will explain how the Gross Settlement Amount is allocated. It will also notify each Potential Opt-In Plaintiff of how to obtain further information about the settlement of this case. (Id. ¶ 6.2.)

  o On cashing the check, the Potential Opt-In Plaintiff will become an "Opt-In Plaintiff" under the terms of the Settlement Agreement. (Id. ¶ 6.4.)

8

- ▪ The settlement checks will state that they may be deposited for cash for 90 days from the date reflected on the check. (Id. ¶ 6.3.)

- ▪ The checks will contain the following language:

  "By depositing or cashing this check, I acknowledge and agree that I am personally releasing all claims against Victra as set forth in the Notice of FLSA Settlement and that any attempt by me to reserve rights or alter or amend the parties' settlement or release will have no legal effect." (Id.)

- ▪ If the Potential Opt-In Plaintiff does not cash the check within the 90-day period and there is no request for a new check within 30 days, the amount of the check will revert to VICTRA. (See id. ¶¶ 3.1, 3.3, 6.3, 6.5.)

- ▪ Any Potential Opt-In Plaintiffs who do not cash their checks within the 90-day period or request a new check within 30 days will not release any claims against VICTRA. (Id. ¶ 6.5.)

- The Settlement Agreement describes the release of claims as follows:

  o [T]he Plaintiffs (including Named Plaintiffs and Opt-In Plaintiffs) on behalf of themselves and each of their respective spouses, heirs, assigns, administrators, executors, beneficiaries, conservators, successors, insurers, and attorneys, voluntarily agree to fully waive, release and forever discharge Victra, including its predecessors, successors, and assigns, and each of their respective parents, subsidiaries, affiliates, divisions, and all of their respective present and former officers, directors, shareholders, employees, insurers, lawyers, and agents (collectively, the "Released Parties") from any and all known and unknown claims arising under federal and/or applicable state and local law relating in any way to the payment or non-payment of regular or overtime wages or compensation or compliance with wage or hour laws, regulations, or ordinances that

9

accrued during the Applicable Class Period, including, without limitation, all state and federal claims for miscalculated and/or unpaid overtime wages, and related claims for penalties, interest, liquidated damages, attorneys' fees, costs, and expenses (the "Released Claims"). Consistent with California law, nothing herein is intended to release any of the Plaintiffs' claims under the Private Attorneys General Act, as provided in Cal. Labor Code § 2699, et seq.

(Id. ¶ 8.1; see also id. at 28-29; ECF No. 58-1 at 3-4.)

On September 27, 2019, "Putative Intervenors Ron Hardney, Manuel Panngasiri, and Michelle Salway, along with the 37 other Store Managers who have opted into the case styled Hardney, et. al. v. ABC Phones of North Carolina, Inc., Case No. 1:19-cv-12722, in the United States District Court for the District of New Jersey ('the Hardney Action')" (collectively, "the Hardney Intervenors") filed the Hardney Motion. (ECF No. 15.) They argue, inter alia, that they have a substantial legal interest in this case because the reach of the proposed settlement encompasses and could possibly release "off-the-clock" FLSA-violation claims they are bringing against VICTRA in another putative collective and class action. (See id. at 13.) VICTRA responded in opposition on October 7, 2019. (ECF No. 26.) Plaintiffs responded in opposition on October 11, 2019. (ECF No. 27.) On October 14, 2019, the Hardney Intervenors filed a motion for leave to file a reply, (ECF No. 28), which the Court denied, (ECF No. 32). The Hardney Intervenors then filed

10

multiple notices of supplemental authority and a supplement to their motion to intervene.  (ECF Nos. 30, 33, 45, 65.)

On February 24, 2020, James Baggott, a former VICTRA store manager, filed the Baggott Motion "for the limited purpose of filing a written objection to the proposed settlement."  (ECF No. 39 at 1; see also Nos. 40, 41.)  VICTRA and Plaintiffs responded in opposition on March 9, 2020.  (ECF Nos. 48, 49.)

On July 1, 2020, Priscilla Solorio and Mariano Diaz, store managers who worked in California and assert wage and hour claims under California law in a different putative class action and represent the State of California in a law enforcement proceeding under PAGA, filed the Solorio and Diaz Motion "to object to the FLSA settlement in this case."  (ECF No. 57 at 2.)  VICTRA and Plaintiffs responded in opposition on July 15, 2020.  (ECF Nos. 59, 61.)

## II.  Jurisdiction

Plaintiffs allege violations of the FLSA.  The Court has subject matter jurisdiction over FLSA claims under the general grant of federal question jurisdiction in 28 U.S.C. § 1331.

## III. Standard of Review

### A.   Standard for Collective Actions Under the FLSA

Section 216(b) of the FLSA permits an employee to recover unpaid overtime compensation by suing an employer "in behalf of himself or themselves and other employees similarly situated."

29 U.S.C. § 216(b).  Unlike class actions under Federal Rule of Civil Procedure 23, when an employee sues his employer in a representative capacity under § 216(b), "similarly situated" plaintiffs choose whether to "opt into" the suit, which is known as a "collective action."  O'Brien v. Ed Donnelly Enters., Inc., 575 F.3d 567, 583 (6th Cir. 2009), abrogated on other grounds by Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663 (2016); Comer v. Wal-Mart Stores, Inc., 454 F.3d 544, 546 (6th Cir. 2006).  To be viable under § 216(b), an FLSA collective action must meet two requirements: (1) the plaintiffs must be "similarly situated"; and (2) all plaintiffs must signal in writing their affirmative consent to participate in the action.  Comer, 454 F.3d at 546 (citing 29 U.S.C. § 216(b), and Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 167–68 (1989)).  District courts have broad discretion in implementing procedures to ensure that these requirements are met.  See Hoffmann-La Roche, 493 U.S. at 169.

### 1. Similarly Situated Plaintiffs

To maintain a collective action under the FLSA, all claimants must be "similarly situated."  29 U.S.C. § 216(b). Unlike class actions, in the collective action context, the term "certify" is used when the court has determined that opt-in plaintiffs are similarly situated.  In making that determination, this Circuit weighs three factors: the "factual and employment settings of the individual[] plaintiffs, the different defenses

to which the plaintiffs may be subject on an individual basis,
[and] the degree of fairness and procedural impact of certifying
the action as a collective action." O'Brien, 575 F.3d at 584;
see also Monroe v. FTS USA, LLC, 815 F.3d 1000, 1011 (6th Cir.),
cert. granted, judgment vacated on other grounds, 137 S. Ct. 590
(2016); Frye v. Baptist Mem'l Hosp., Inc., 495 F. App'x 669, 672
(6th Cir. 2012). "The heart of [this inquiry] is whether the
plaintiffs should be permitted to bring their claims of liability
and damages as a group based on representative, rather than
personal, evidence." Pierce v. Wyndham Vacation Resorts, Inc.,
922 F.3d 741, 745 (6th Cir. 2019) (citing 7B Charles Alan Wright
et al., Federal Practice and Procedure § 1807 (3d ed. 2005)).
Plaintiffs who opt into an action before a court's finding that
they are similarly situated do not properly become parties to
the action. See Hollins v. Regency Corp., 867 F.3d 830, 833-34
(7th Cir. 2017) (holding that individuals who filed opt-in forms
prior to the court's finding that the plaintiffs were similarly
situated did not bind the individuals to the action); Andrews v.
Am.'s Living Ctrs., LLC, 2017 WL 3470939, at *3 (W.D.N.C. Aug.
11, 2017) (finding that, "[b]ecause no determination ha[d] been
made that the proposed members of the collective action [were]
'similarly situated,' an entry of a default judgment, if
appropriate at all, [wa]s proper only as to the named Plaintiff"
and not to other individuals who had opted in). Plaintiffs bear

13

the burden of showing that they are similarly situated.  O'Brien,
575 F.3d at 584.

This Circuit has approved a two-stage certification
process.  See, e.g., Frye, 495 F. App'x at 671; In re HCR
ManorCare, Inc., 2011 WL 7461073, at *1 (6th Cir. Sept. 28,
2011); see also Monroe v. FTS USA, LLC, 860 F.3d 398, 397 (6th
Cir. 2017) ("Courts typically bifurcate certification of FLSA
collective action cases.").  At the first stage, pre-discovery,
the court may grant conditional certification of the collective
action, deciding whether the members as described in the
pleadings are similarly situated and determining the contour and
size of the group of employees that may be represented in the
action so as to authorize notice to possible collective members
who may want to participate.  See Monroe, 860 F.3d at 397 (citing
Comer, 454 F.3d at 546).  The burden in deciding whether members
are "similarly situated" at this initial stage can be met "on a
modest factual showing," and the court should use "a fairly
lenient standard [that] typically results
in . . . certification."  Comer, 454 F.3d at 547 (quotation marks
and citations omitted).

At the second stage -- "after all of the opt-in forms have
been received and discovery has concluded" -- the court makes
another "similarly situated" determination (traditionally on
motion of the defendant for decertification, see Campbell v.

14

City of Los Angeles, 903 F.3d 1090, 1109 (9th Cir. 2018); Wilks v. Pep Boys, 2006 WL 2821700, at *2 (M.D. Tenn. Sept. 26, 2006)), but applies a "stricter standard." Comer, 454 F.3d at 546–47 (quotation marks and citations omitted); see also Frye, 495 F. App'x at 671. If plaintiffs are able to satisfy their burden at this stage, the case may proceed collectively to trial. See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1218 (11th Cir. 2001). "If the court concludes that plaintiffs are not similarly situated, it 'decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives -- i.e. the original plaintiffs -- proceed to trial on their individual claims." White v. Baptist Mem'l Health Care Corp., 2011 WL 1883959, at *4 (W.D. Tenn. May 17, 2011) (citations omitted), aff'd, 699 F.3d 869 (6th Cir. 2012).

### 2.  Opt-In Requirement

To satisfy the "opt-in" requirement of § 216(b), plaintiffs who seek to be parties must file written consents with the court. 29 U.S.C. § 216(b); Wright, § 1807 (collecting cases). Unless a plaintiff has opted in by filing a written consent with the court, he or she is not bound by the results of the litigation. Ballaris v. Wacker Siltronic Corp., 370 F.3d 901, 906 n.9 (9th Cir. 2004) (citation omitted); Wright, § 1807; cf. Ware v. CKF Enters., Inc., 2020 WL 1170223, at *2 (E.D. Ky. Mar. 11, 2020) ("[P]ost-approval filers who are not considered opt-in

plaintiffs and will not submit the FLSA opt-in consent forms under the proposed agreement are effectively not part of the collective."); Marichal v. Attending Home Care Servs., LLC, 432 F. Supp. 3d 271, 279 (E.D.N.Y. 2020) (citing Hood v. Uber Techs., Inc., 2019 WL 93546, at *3 (M.D.N.C. Jan. 3, 2019) ("It is long established that a client must give his consent to settle. . . . [T]he named plaintiff and his counsel in a collective action cannot settle a case on behalf of an opt-in plaintiff: the affirmative assent of each opt-in plaintiff -- as a party to the case -- is required.")).

## B.  Standard for Collective Action Settlements Under the FLSA

The FLSA's overtime compensation provisions are "mandatory and, except as otherwise provided by statute, are generally not subject to being waived, bargained, or modified by contract or by settlement." Kritzer v. Safelife Solutions, LLC, 2012 WL 1945144, at *5 (S.D. Ohio May 30, 2012) (citing Dillworth v. Case Farms Processing, Inc., 2010 WL 776933, at *5 (N.D. Ohio Mar. 8, 2010), and Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697 (1945)).  There are two ways in which claims for back wages under the FLSA can be settled or compromised.  See Lynn's Food Stores, Inc. v. United States, 679 F.2d 1350, 1352-53 (11th Cir. 1982).  First, the Department of Labor can supervise a settlement.  See Collins v. Sanderson Farms, Inc., 568 F. Supp. 2d 714, 719 (E.D.

16

La. 2008) (citing 29 U.S.C. § 216(c)).  Second, "[w]hen employees bring a private action for back wages under the FLSA, and present to the district court a proposed settlement, the district court may enter a stipulated judgment after scrutinizing the settlement for fairness."  Lynn's, 679 F.2d at 1353 (citing Schulte, Inc. v. Gangi, 328 U.S. 108, 113 n.8 (1946)).[5]

When parties submit a proposed FLSA settlement for a court's review, the court must review the proposed settlement to ensure that it is "a fair and reasonable resolution of a bona fide dispute over FLSA provisions."  Id. at 1355; see also Does 1-2 v. Déjà Vu Servs., Inc., 925 F.3d 886 (6th Cir. 2019), aff'g 2017 WL 2629101 (E.D. Mich. Jun. 19, 2017) (affirming approval of a settlement of FLSA claims where the district court applied the Lynn's Food Stores test).

"A bona fide dispute exists when there are legitimate questions about 'the existence and extent of [d]efendant's FLSA liability.'"  Selk v. Pioneers Mem'l Healthcare Dist., 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016) (quoting Ambrosino v. Home Depot U.S.A., Inc., 2014 WL 1671489 (S.D. Cal. Apr. 28, 2014)).

---

[5] There is a Circuit split about whether judicial approval is mandated for all types of FLSA settlements.  See Barbee v. Big River Steel, LLC, 927 F.3d 1024, 1026 (8th Cir. 2019) (detailing split).  This Circuit has not directly addressed the question, but the majority view is that judicial approval is required for FLSA collective action settlements brought under 29 U.S.C. § 216(b).  See, e.g., Steele v. Staffmark Invs., LLC, 172 F. Supp. 3d 1024, 1026-29 (W.D. Tenn. 2016).

"There must be some doubt . . . that the plaintiffs would succeed on the merits through litigation of their [FLSA] claims." Id. (quotation marks and citation omitted). "A proposed settlement resolves a bona fide dispute when it reflect[s] a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in dispute, rather than a mere waiver of statutory rights brought about by an employer's overreaching." Alvarez v. BI Inc., 2020 WL 1694294, at *4 (E.D. Pa. Apr. 6, 2020) (citations and quotation marks omitted).

The court must find that the settlement is fair and reasonable. Lynn's, 679 F.2d at 1353. This Circuit has not directly stated the factors courts are to consider in deciding whether an FLSA collective action settlement is fair and reasonable. In analyzing a hybrid class action-collective action FLSA settlement, this Circuit has stated the factors it considers: (1) the risk of fraud or collusion, (2) the complexity, expense and likely duration of the litigation, (3) the amount of discovery engaged in by the parties, (4) the likelihood of success on the merits, (5) the opinions of class counsel and class representatives, (6) the reaction of absent class members, and (7) the public interest.[6] Does 1-2, 925 F.3d

---

[6] District courts in this Circuit have stated these factors: (1) the plaintiff's range of possible recovery; (2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses; (3) the seriousness of the litigation risks faced by the parties; (4) whether

at 894-95 (citing Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp. ("UAW"), 497 F.3d 615, 631 (6th Cir. 2007)); see also Fitzgerald v. P.L. Mktg., Inc., No. 2:17-cv-02251, 2020 WL 3621250, at *6 (W.D. Tenn. July 2, 2020). This Court and other district courts in this Circuit have applied these factors in analyzing the fairness and reasonableness of collective action settlements. See, e.g., Fitzgerald, 2020 WL 3621250, at *6; Hawkins v. Accurate Nursing Servs., Inc., 2020 WL 1031530, at *1 (N.D. Ohio Mar. 3, 2020); Robinson v. Sheppard Performance Grp., Inc., 2020 WL 619603, at *2 (E.D. Mich. Feb. 10, 2020); Osman v. Grube, Inc., 2018 WL 2095172, at *1 (N.D. Ohio May 4, 2018) (citing Cannon v. Time Warner NY Cable LLC, 2015 WL 4498808 (D. Colo. July 24, 2015); Crawford v. Lexington-Fayette Urban Cty. Gov't, 2008 WL 4724499, at *3, *6-9 (E.D. Ky. Oct. 23, 2008). The Court must consider these factors in determining whether a settlement is fair and reasonable. See Lynn's, 679 F.2d at 1353; Selk, 159 F. Supp. 3d at 1173.

A court "must not simply rubber-stamp [settlement agreements] as approved[.]" Snook v. Valley Ob-Gyn Clinic, P.C.,

---

the settlement agreement is the product of arm's-length bargaining between experienced counsel; and (5) the possibility of fraud or collusion. See Farkas v. Boschert, 2018 WL 3100905, at *1-2 (E.D. Mich. June 25, 2018) (citing Wolinsky v. Scholastic Inc., 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012)).

2015 WL 144400, at *1 (E.D. Mich. Jan. 12, 2015); see also Williams v. Alimar Sec., Inc., 2016 WL 6405798, at *4 (E.D. Mich. Oct. 31, 2016). "Parties to [a] settlement must proffer sufficient evidence to allow the district court to review the terms and legitimacy of the settlement." UAW, 497 F.3d at 635 (citing In re Gen. Tire & Rubber Co. Sec. Litig., 726 F.2d 1075, 1084 n.6 (6th Cir. 1984)). A court does not have the authority to delete, modify, or substitute certain provisions of a settlement agreement, but rather, the settlement agreement "must stand or fall in its entirety." See Smothers v. NorthStar Alarm Servs., LLC, 2019 WL 280294, at *9 (E.D. Cal. Jan. 22, 2019) (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)).

Pursuant the FLSA's statutory requirements, in an FLSA collective action case, a court will grant a motion for settlement approval only after finding that: (1) the opt-in plaintiffs are "similarly situated"; (2) the opt-in plaintiffs have properly filed written consents with the court; and (3) the settlement is "a fair and reasonable resolution of a bona fide dispute." See 29 U.S.C. § 216(b); Comer, 454 F.3d at 546; Lynn's, 679 F.2d at 1353.

## C. Standard for Motions to Intervene

Any person may intervene in a case as a matter of right (mandatory intervention) or if the Court allows permissive

intervention.   Fed.   R.   Civ.   P.   24(a)-(b).   "[Rule]   24
distinguishes a permissive intervenor from an intervenor of right
by the stake each has in the litigation.  The intervenor of right
has an interest in the litigation that it cannot fully protect
without joining the litigation, while the permissive intervenor
does not."  Stringfellow v. Concerned Neighbors in Action, 480
U.S.   370,   381   (1987)   (Brennan,   J.,   concurring   in   part   and
concurring   in   the   judgment).    "Rule   24   should   be   'broadly
construed in favor of potential intervenors.'"  Stupak-Thrall v.
Glickman, 226 F.3d 467, 472 (6th Cir. 2000) (quoting Purnell v.
Akron, 925 F.2d 941, 950 (6th Cir. 1991)).  However, that "does
not mean that Rule 24 poses no barrier to intervention at all."
Id.  "[A] district court is required to accept as true the non-
conclusory   allegations   made   in   support   of   an   intervention
motion."  Parkwest Dev., LLC v. Ellahi, 2018 WL 3640433, at *2
(E.D.  Mich.  Aug.  1,  2018)  (citing  Sw.  Ctr.  for  Biological
Diversity v. Berg, 268 F.3d 810, 819 (9th Cir. 2001)).

Mandatory  intervention  requires  putative  intervenors  to
establish: "(1) timeliness of the application to intervene, (2)
the   applicant's   substantial   legal   interest   in   the   case,
(3) impairment  of  the  applicant's  ability  to  protect  that
interest  in  the  absence  of  intervention,  and  (4)  inadequate
representation of that interest by parties already before the
court."  Stupak-Thrall, 226 F.3d at 471 (citing Mich. State AFL-

CIO v. Miller, 103 F.3d 1240, 1245 (6th Cir. 1997), and Grutter
v. Bollinger, 188 F.3d 394, 397–98 (6th Cir. 1999)).  A motion
for mandatory intervention must be denied if the proposed
intervenor cannot satisfy all of these criteria.  United States
v. Michigan, 424 F.3d 438, 443 (6th Cir. 2005) (citing Grubbs v.
Norris, 870 F.2d 343, 345 (6th Cir. 1989)).

"To intervene permissively, a proposed intervenor must
establish that the motion for intervention is timely and alleges
at least one common question of law or fact." Michigan, 424
F.3d at 445 (citing Mich. State AFL–CIO, 103 F.3d at 1248).
"Once [the timeliness and common question of law or fact
elements] are established, the district court must then balance
undue delay and prejudice to the original parties, if any, and
any other relevant factors to determine whether, in the court's
discretion, intervention should be allowed." Id. (citing Mich.
State AFL–CIO, 103 F.3d at 1248).  "[T]he decision whether to
grant permissive intervention resides largely in the discretion
of the district court." Stringfellow, 480 U.S. at 382 n.1
(Brennan, J., concurring in part and concurring in the judgment).

**IV.  Analysis**

    **A. Motion for Settlement Approval**

The Court construes the parties' Motion for Settlement
Approval to ask the Court to approve: (1) that the Plaintiffs
and Potential Opt-In Plaintiffs are similarly situated; (2) the

structure of the First Amended Settlement Agreement, including the process for opting into the suit and the issuance of Notice of FLSA Settlement to the Potential Opt-In Plaintiffs; (3) the Gross Settlement Amount; (4) the Named-Plaintiffs' service awards; and (5) the attorneys' fees and costs awards. (See generally ECF No. 14.)

There are structural and substantive problems with the First Amended Settlement Agreement such that the Court cannot conclude that the settlement is "a fair and reasonable resolution of a bona fide dispute." There are justiciability problems with the First Amended Settlement Agreement that do not comport with Article III. The form of the settlement calls into question its fairness. Cf. In re Telectronics Pacing Sys., Inc., 221 F.3d 870, 882 (6th Cir. 2000) (remanding to district court when "the form of the settlement call[ed] into question its fairness and raise[d] constitutional concerns").

### 1. Similarly Situated

This Court has not certified that any plaintiffs are similarly situated. For the Court to approve the settlement, the Court must find that all plaintiffs are similarly situated. 29 U.S.C. § 216(b); Smith v. Kaiser Found. Hosps., 2019 WL 5864170, at *5 (S.D. Cal. Nov. 7, 2019) ("[W]hen considering a motion to approve the settlement of . . . an FLSA collective action, before a . . . collective has been certified, the Court

must first certify the . . . collective for the purpose of the settlement."); Murillo v. Pac. Gas & Elec. Co., 266 F.R.D. 468, 471 (E.D. Cal. 2010) ("Even when the parties settle, the court must make some final class certification finding before approving a collective action settlement.") (citations and quotation marks omitted).   As discussed supra, courts normally conduct the similarly situated analysis through a two-step certification process.  See Comer, 454 F.3d at 546.  Although this Circuit has approved the two-step process, In re HCR ManorCare, Inc., 2011 WL 7461073, at *1, nothing in the FLSA mandates it.   See Hipp, 252 F.3d at 1219.  District courts in this Circuit have found opt-in plaintiffs similarly situated at the same time they have approved the settlement (i.e., in a one-step approval process). See, e.g., Osman, 2018 WL 2095172, at *2.

VICTRA asks the Court to conduct a one-step approval analysis here.  (See ECF No. 49 at 9-11.)  As illustrated by the deficiencies with this settlement proposal discussed infra, a two-step certification process is the more prudent course of action.  See Prena v. BMO Fin. Corp., 2015 WL 2344949, at *1 (N.D. Ill. May 15, 2015) (approving a one-step process, but noting that "two steps might be needed if the one-step process would be unduly influential in causing members to opt-in without considering all of the risks and the benefits are very low; in other words, a concern that the reasonableness of the settlement

is a close question"). That the parties ask the Court to conduct a one-step approval process is not in itself fatal to the Motion for Settlement Approval. See, e.g., Carr v. Bob Evans Farms, Inc., 2018 WL 7508650, at *2 (N.D. Ohio July 27, 2018) (approving settlement agreement in one-step process when all the opt-in plaintiffs were properly before the Court).

The parties stipulate that "the Named Plaintiffs, Opt-In Plaintiffs, and the Potential Opt-In Plaintiffs are similarly situated for purposes of 29 U.S.C. § 216(b) of the [FLSA]." (ECF No. 14-1 ¶ 1.1.) The FAC alleges class definitions that, on their face, appear to meet the "fairly lenient standard" that the Court undertakes in the initial step of a certification analysis. (See ECF No. 12 ¶¶ 4-5); Murillo, 266 F.R.D. at 471 ("District courts have held that conditional certification requires only that plaintiffs make substantial allegations that the putative class members were subject to a single illegal policy, plan or decision.") (citations and quotation marks omitted). Because of the other substantive deficiencies in the First Amended Settlement Agreement, however, the Court exercises its discretion not to certify the collective action at this time. See Monroe, 815 F.3d at 1010-11. Although Plaintiffs and Potential Opt-In Plaintiffs may be similarly situated, the proposed notice (in this case the proposed Notice of Settlement Agreement) is fatally flawed. The parties may move the Court to

certify and issue notice of the collective action at another time.

### 2. Opt In

There are statutory deficiencies in the First Amended Settlement Agreement that are fatal to its approval. The first deficiency is the method by which the First Amended Settlement Agreement seeks to have individuals opt into the action. The FLSA requires that, to opt into a collective action, an individual must file a written consent with the Court. Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 75 (2013). That mandate is clear and unequivocal: "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b); see also Harkins v. Riverboat Servs., Inc., 385 F.3d 1099, 1101 (7th Cir. 2004) ("The statute is unambiguous: if you haven't given your written consent to join the suit, or if you have but it hasn't been filed with the court, you're not a party."). Although the FLSA does not specify the form that this written consent must take, Frye, 495 F. App'x at 676, multiple courts have found that cashing a check cannot satisfy § 216(b)'s opt-in mandate. See, e.g., Smith, 2019 WL 5864170, at *10 (cashing a check does not satisfy the notice or consent requirements of § 216(b)); Shepardson v. Midway Indus., Inc., 2019 WL 2743435,

at *2 (W.D. Ark. July 1, 2019) ("[C]ourts have held it improper
to treat those who cash their settlement checks as having opted
in."); Douglas v. Allied Universal Sec. Servs., 371 F. Supp. 3d
78, 85 (E.D.N.Y.), reconsideration denied, 381 F. Supp. 3d 239
(E.D.N.Y. 2019) ("FLSA does not allow the cashing of a settlement
check to serve as an employee's consent to become a collective
member."); Smothers, 2019 WL 280294, at *11 ("This court thus
joins those that have consulted § 216(b)'s requirements and
rejected similar opt-in by settlement check proposals.");
Robinson v. Flowers Baking Co. of Lenexa, LLC, 2017 WL 4037720,
at *1 n.1 (D. Kan. Sept. 13, 2017) ("Plaintiffs assert in their
motion that settlement class members will release their FLSA
claims only if they cash their settlement checks.  The argument
is rejected. . . . [P]laintiffs have offered no authority that
cashing a check is the same as filing a written consent form for
purposes of § 216(b)."); Johnson v. Quantum Learning Network,
Inc., 2016 WL 8729941, at *1 (N.D. Cal. Aug. 12, 2016) ("[T]he
Settlement provides that FLSA collective action members opt in
to the collective action by cashing or depositing their
settlement checks. . . . This opt in procedure violates the
FLSA."); Kempen v. Matheson Tri-Gas, Inc., 2016 WL 4073336, at
*9 (N.D. Cal. Aug. 1, 2016) ("[T]he settlement agreement provides
that nationwide FLSA overtime putative class members must opt-

in to the class by cashing or depositing their settlement check. . . . This violates the FLSA.").

The First Amended Settlement Agreement provides that, "[u]pon cashing the check for his or her Individual Settlement Payment, each Potential Opt-In Plaintiff will become an 'Opt-In Plaintiff' under the terms of this Agreement and thus subject to all terms applicable to Plaintiffs." (ECF No. 14-1 ¶ 6.4.) That does not satisfy the unequivocal language of the statute. See 29 U.S.C. § 216(b). VICTRA cites cases where courts have allowed cashing checks to satisfy the opt-in requirement. (ECF No. 49 at 10-12) (citing Kis v. Covelli Enters., Inc., 2019 WL 3369124, at *17 (N.D. Ohio July 26, 2019); Day v. NuCO2 Mgmt., LLC, 2018 WL 2473472, at *1 (N.D. Ill. May 18, 2018); Basic v. Byline Bank, Inc., 2015 WL 13763028, at *3 (N.D. Ill. Oct. 26, 2015). Those cases are not persuasive. None of them considered whether cashing a check satisfies the opt-in requirements of § 216(b). This Court agrees with those courts that have substantively addressed the issue: cashing a check cannot satisfy the plain language of § 216(b). See Smothers, 2019 WL 280294, at *11 (distinguishing and rejecting cases that have allowed cashing checks to satisfy the opt-in requirement).

The second deficiency is that, even allowing latitude as to the form of the written consent, "the requirement remains a filed written consent." Frye, 495 F. App'x at 676 (emphasis in

original).   Under  the  current  terms  of  the  First  Amended
Settlement Agreement, there is no procedure by which any consent
by the Opt-In Plaintiffs will be filed with the Court.   That
makes the First Amended Settlement Agreement ineffective as to
any Opt-In Plaintiff who cashes a check.  See Douglas, 371 F.
Supp. 3d at 86 ("While the proposed settlement contains opt-in
language on the back of every check, which would be signed by
any employee cashing it, there is no mechanism in the agreement
for filing such consent with the Court.   That renders the
proposed   collective   action   settlement   incompatible   with
§ 216(b)."). VICTRA represents that the Court will "receive a
final list of the opt-in plaintiffs in the period of time after
settlement approval." (ECF No. 49 at 12) (emphasis in original).
That is not what the First Amended Settlement Agreement provides.
The First Amended Settlement Agreement says that the Settlement
Administrator will "track[] and maintain[] records of the
[individuals] who cashed their settlment checks" and "confirm[]
in   writing   to . . . the   Court   its   completion   of   the
administration of the settlement and retain[] copies of all
endorsed settlement checks."  (See ECF No. 14-1 ¶ 3.6(j)-(l).)
Even if the First Amended Settlement Agreement expressly provided
that the Settlement Administrator would file with the Court a
list of all members who cashed their checks, that method would
be deficient, because it would not comply with the plain language

of § 216(b): it would not be the written consent of each individual Opt-In Plaintiff filed with the Court. See Smothers, 2019 WL 280294, at *11 (rejecting proposal that settlement administrator file a declaration with the court listing the names of the members who cashed the checks).

The failure of the First Amended Settlement Agreement to satisfy the statutory mandates of § 216(b) is fatal to its approval as to any plaintiffs who wish to opt into the litigation.

### 3. Notice

The First Amended Settlement Agreement has the opt-in process "entirely backwards." Douglas, 371 F. Supp. 3d at 86. "The structure of the collective action provision of [the] FLSA -- including the requirement that the opt-ins be filed -- is to ensure the presence of plaintiffs before the court." Id. "Unlike in a class action, where the rights of unnamed parties are adjudicated in their absence (or via representative), the opposite is true in a collective action." Id. The benefits of § 216(b) "depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." Hoffmann-La Roche, 493 U.S. at 170. The Court must assure that plaintiffs who decide to opt in are allowed to do so in "an efficient and proper way" that is "orderly, sensible, and not

otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure." Id. at 170-71.

The parties ask the Court to "dismiss[] [this action] with prejudice upon the Court's entry of an order approving the settlement." (ECF No. 14 at 10.) The First Amended Settlement Agreement provides that "[f]inal approval of this settlement by the Court shall result in the dismissal with prejudice of the Named Plaintiffs' and all Opt-In Plaintiffs' claims against the Defendant in the above-captioned action and a full and final release of all Released Claims that the Named Plaintiffs and Opt-in Plaintiffs may have against Victra." (ECF No. 14-1 ¶ 2.1.)

The First Amended Settlement Agreement provides that, thirty days after the Court has approved the Settlement Agreement (i.e., after the case has been "dismissed with prejudice" and the opportunity to appeal the Court's order has passed), the Settlement Administrator will send Potential Opt-In Plaintiffs a "Notice of FLSA Settlement." They will then learn about the action, possibly for the first time, and, possibly for the first time, have the opportunity to opt into it by cashing a check. They will then release all of their claims according to the terms of the already-agreed-upon-and-approved settlement agreement. (See id. ¶¶ 6.2-6.3.) Potential Opt-In Plaintiffs will not "have the ability to alter or amend the terms of [the Settlement

31

Agreement]" and "any attempt by [the Opt-In Plaintiffs] to reserve rights or alter or amend the [Settlement Agreement] or release will have no legal effect." (<u>Id.</u> ¶¶ 6.3-6.4.)

The parties ask the Court to approve the settlement on behalf of individuals who are not before the Court and to dismiss their claims with prejudice before they have appeared or had the opportunity to be heard. That is not an "orderly, sensible," or "proper way" to resolve this case. <u>Hoffmann-La Roche</u>, 493 U.S. at 170. The Court declines to approve it.

The structure of the First Amended Settlement Agreement raises serious jurisdictional and justiciability issues. Because no other plaintiffs have opted into the action, the First Amended Settlement Agreement, as currently structured, binds only the Named Plaintiffs to its terms. The case would become moot once the Court approves the First Amended Settlement Agreement.

Federal courts generally do not have jurisdiction over a settlement once the case has been dismissed. <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 380 (1994). There is an exception when a court provides in its order that it will retain ancillary jurisdiction to enforce the terms of the settlement. <u>See</u> <u>id.</u> at 381; <u>Moore v. U.S. Postal Serv.</u>, 369 F. App'x 712, 716 (6th Cir. 2010); <u>Johnson v. W2007 Grace</u>

<u>Acquisition I, Inc.</u>, 2015 WL 12001269, at *17 (W.D. Tenn. Dec. 4, 2015).

The First Amended Settlement Agreement provides that the Court will have "continuing jurisdiction to interpret and enforce this Agreement and to hear and adjudicate any dispute or litigation arising from the Agreement." (ECF No. 14-1 ¶ 10.1.) VICTRA argues that there are no jurisdictional problems because, "[w]hile approval of the Settlement would include dismissal of this action, courts routinely dismiss such actions without prejudice 'with leave to reinstate' on or before a certain date" and courts can retain jurisdiction over actions "for the purposes of supervising the implementation, enforcement, construction, administration, and interpretation of [settlement agreements], including for overseeing the distribution of settlement funds." (ECF No. 49 at 12) (citing cases). That argument is not well-taken. VICTRA is not asking the Court to retain jurisdiction only to enforce the terms of the settlement agreement. VICTRA is asking the Court to retain jurisdiction to <u>assert</u> jurisdiction over any party who desires to opt into the suit. That power "is quite remote" from the purpose for which courts retain ancillary jurisdiction. See <u>Kokkonen</u>, 511 U.S. at 379-81.

This is also where justiciability problems arise. If the Court granted the parties' Motion for Settlement Approval, there would no longer be a live case or controversy and the case would

become moot. Both Named Plaintiffs would no longer have a legally cognizable interest in the outcome, and no other plaintiffs would have opted into the suit. See Parra v. Quality Controlled Concrete, LLC, 2015 WL 12750445, at *2 (M.D.N.C. Mar. 11, 2015) (citations omitted); see also Xiao Ling Chen v. XpresSpa at Terminal 4 JFK LLC, 2018 WL 1633027, at *6 (E.D.N.Y. Mar. 30, 2018) ("If the Court dismisses the case, then recipients of the settlement checks would have no litigation to opt in to."); cf. Genesis Healthcare Corp., 569 U.S. at 75 (holding that, if a named plaintiff's claim is mooted before conditional certification and other plaintiffs have opted in, the collective action is moot as well and must be dismissed).

Courts have found that actions would become moot in cases where the proposed settlement procedures were virtually identical to those proposed here. See, e.g., Parra, 2015 WL 12750445, at *2-3; Leigh v. Bottling Grp., LLC, 2011 WL 1231161, at *2 (D. Md. Mar. 29, 2011) ("Here, the parties ask the court to approve the settlement, certify the class of putative plaintiffs, and facilitate notice to the class members of their rights to opt-in to the settlement at the same time," but, "if the named plaintiffs settle their claims, the action may be rendered moot"); see also Perez v. Avatar Properties, Inc., 2008 WL 4853642, at *3 (M.D. Fla. Nov. 6, 2008). The cases VICTRA cites are not apposite because they do not address these

jurisdictional deficiencies and do not cite any authority under which the courts properly retained jurisdiction.  See Osman, 2018 WL 2095172, at *6; Day, 2018 WL 2473472, at *3; Besic, 2015 WL 13763028, at *3; Prena, 2015 WL 2344949, at *2.

### 4.  Other Deficiencies

A court reviewing a proposed settlement under the FLSA should ensure that the settlement is "a fair and reasonable resolution of a bona fide dispute over FLSA provisions." Lynn's, 679 F.2d at 1355.   The Court questions the fairness and reasonableness of the First Amended Settlement Agreement.

### a. Potential Recovery

"To determine whether a settlement amount is reasonable, the Court must consider the amount obtained in recovery against the estimated value of the class claims if successfully litigated." Smith, 2019 WL 5864170, at *11.  "A district court evaluates the plaintiff's range of potential recovery to ensure that the settlement amount agreed to bears some reasonable relationship to the true settlement value of the claims." Selk, 159 F. Supp. 3d at 1174 (citing Daniels v. Aeropostale W., Inc., 2014 WL 2215708, at *4 (N.D. Cal. May 29, 2014) ("To protect the absent opt-in members, it is critical to know the total triable amount so that the judge can evaluate the fairness and reasonableness of the proposed settlement.")).  "Proponents of [a] settlement 'must proffer sufficient evidence to allow the

district court to review the terms and legitimacy of the settlement.'"  Castillo v. Morales, Inc., 2015 WL 13021899, at *4 (S.D. Ohio Dec. 22, 2015) (quoting UAW, 497 F.3d at 635).  A settlement agreement may be denied when a motion for settlement approval "lacks sufficient evidence or information that would allow the Court to evaluate the reasonableness of the settlement amount."  Smith, 2019 WL 5864170, at *11.

The Court has no information on which to evaluate whether the amount VICTRA has agreed to pay to settle this case is reasonable in relation to the maximum recovery Plaintiffs and any Opt-In Plaintiff could have obtained with a favorable judgment on the merits.  The parties' conclusorily state that "the specific back pay settlement amounts proposed by the Parties reflect a reasonable apportionment of a settlement based on the number of workweeks worked by the Named Plaintiffs and putative class during the relevant period when the Defendant was paying its Store Managers and Non-Managers on an hourly basis and takes into account the amount of commissions earned.  These calculations are the result of detailed work by counsel and the mediator in the negotiations."  (ECF No. 14 at 9.)

The parties assert that there is a point allocation system, and represent that "50% of each Individual Settlement Payment will be attributable to backpay; 50% will be attributable to liquidated damages."  (ECF No. 14-1 ¶¶ 5.2, 5.4.)  The parties

do not provide estimates of the number of overtime hours worked
by each Plaintiff or Potential Opt-In Plaintiff or information
about the potential range of recovery for each Plaintiff or
Potential Opt-In Plaintiff.   It impossible for the Court to
determine whether the amount to be paid to each Plaintiff or
Potential Opt-In Plaintiff under the point allocation system is
fair and reasonable.   See Williams, 2016 WL 6405798, at *4
(denying approval of settlement agreement when "the Court has no
means for analyzing whether the settlement is a reasonable
compromise of [the plaintiffs'] claims" because the parties'
proposal lacked "any indication of the amount of unpaid wages
Plaintiffs claim they are owed and the amount of liquidated
damages they could recover if they prevail"); Lopez v. Nights of
Cabiria, LLC, 96 F. Supp. 3d 170, 176 (S.D.N.Y. 2015) (denying
settlement agreement in part because the parties did not provide
the court with sufficient information to determine how the
parties arrived at the recovery amounts); Ambrosino, 2014 WL
1671489, at *2 (denying approval of a settlement agreement when
the parties did not "provide estimates regarding the number of
overtime hours worked by each Plaintiff and information regarding
the potential range of recovery for each Plaintiff"); Khanna v.
Inter-Con Sec. Sys., Inc., 2012 WL 4465558, at *11 (E.D. Cal.
Sept. 25, 2012) (rejecting FLSA settlement in part because

counsel provided no information about the potential range of recovery).

The information the parties provide is insufficient for the Court to determine whether the total Gross Settlement Amount is a fair and reasonable settlement of any potential recovery amount.

### b. Overbroad Release

A settlement agreement that includes an overbroad release provision may be found unfair and unreasonable. See Selk, 159 F. Supp. 3d at 1178. In analyzing whether a release is overbroad, this Circuit has said that "the question is not whether the definition of the claim in the complaint and the definition of the claim in the release overlap perfectly; it is whether the released claims share a 'factual predicate' with the claims pled in the complaint." Does 1-2, 925 F.3d at 900 (citing Moulton v. U.S. Steel Corp., 581 F.3d 344, 349 (6th Cir. 2009) (internal citations omitted)). The Court must closely scrutinize release provisions in proposed FLSA settlements

> to ensure that class members are not pressured into forfeiting claims, or waiving rights, unrelated to the litigation. The concern is that an expansive release of claims would effectively allow employers to use employee wages –– wages that are guaranteed by statute –– as a bargaining chip to extract valuable concessions from employees. Courts are especially skeptical of release provisions that require employees to forfeit claims designed to advance public values through private litigation, such as claims for discrimination under Title VII of the Civil Rights Act of 1964. Thus, when a FLSA

settlement provides that opt-in members will receive unpaid wages and related damages, but nothing more, a release provision should be limited to the wage and hour claims at issue.  Only when opt-in plaintiffs receive independent compensation, or provide specific evidence that they fully understand the breadth of the release, will a broad release of claims survive a presumption of unfairness.  Otherwise, a gap between the allegations brought in the case and the claims released in a settlement agreement will militate against finding the settlement fair and reasonable.

Selk, 159 F. Supp. 3d at 1178 (citations and quotation marks omitted).

Under the terms of the First Amended Settlement Agreement, Plaintiffs and any Opt-In Plaintiff would release VICTRA and other entities

from any and all known and unknown claims arising under federal and/or applicable state and local law relating in any way to the payment or non-payment of regular or overtime wages or compensation or compliance with wage or hour laws, regulations, or ordinances that accrued during the Applicable Class Period, including, without limitation, all state and federal claims for miscalculated and/or unpaid overtime wages, and related claims for penalties, interest, liquidated damages, attorneys' fees, costs, and expenses.

(ECF No. 14-1 ¶ 8.1.)  The General Release Agreement[7] purports to release any Opt-In Plaintiff from claims brought under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Employee Retirement Income Security Act of 1974, the Immigration Reform Control Act, the Americans with Disabilities

---

[7] The General Release Agreement is the agreement the parties propose to have sent to each Potential Opt-In Plaintiff.  (ECF No. 14-1 at 28-30.)  It is substantially broader than the Release in the First Amended Settlement Agreement.  (ECF No. 14-1 ¶ 8.1.)

Act of 1990, the National Labor Relations Act, the Occupational
Safety and Health Act, the Family Medical Leave Act of 1993, any
state discrimination law, any state wage and hour law, any local,
state or federal law, regulation or ordinance, any public policy,
contract, tort, or common law, any claims related to the costs,
fees, or other expenses including attorneys' fees incurred in
these matters, any employment contract, any claims related to
incentive compensation plan or stock option plan with any of the
Released parties or to any ownership interest in any Released
Party, and any claims related to compensation or benefits of any
kind. (See ECF No. 14-1 at 28.)

Named Plaintiffs bring only two types of claims under the
FLSA. (ECF No. 12.) The factual predicates for those claims
are: (1) that commissions and bonuses paid by VICTRA should have
been included in the computation of the regular rate used to
compute the employees' overtime pay; and (2) that VICTRA failed
to compensate its store managers for off-the-clock work that
they performed, specifically, participating in mandatory
conference calls scheduled outside of managers' shifts,
responding to employee calls after work, before work and on days
off, responding to employee text messages, and routinely checking
and responding to issues brought up in a messaging application.
(ECF No. 12 ¶¶ 21-23, 28.)

The proposed Release is overbroad, unreasonable, and unfair because it "go[es] far beyond the FLSA claim[s]" and purports to release claims that do not share the factual predicates of the claims pled in the FAC. Daniels, 2014 WL 2215708, at *4. Multiple courts have found similar release language overbroad and declined to approve FLSA settlement agreements, in part, because of those overbroad releases. See, e.g., Garcia v. Jambox, Inc., 2015 WL 2359502, at *4 (S.D.N.Y. Apr. 27, 2015); Lopez, 96 F. Supp. 3d at 181; Ambrosino, 2014 WL 1671489, at *2- 3; Camacho v. Ess-A-Bagel, Inc., 2014 WL 6985633, at *4 (S.D.N.Y. Dec. 11, 2014). An employer should not use a settlement agreement to "purchase a broad-based litigation shield in exchange for unpaid wages that class members are entitled to by statute." Selk, 159 F. Supp. 3d at 1179. Employers cannot "erase all liability whatsoever in exchange for partial payment of wages allegedly required by statute." Camacho, 2014 WL 6985633, at *4. The Court cannot approve a settlement agreement unless the Release is written to include only claims that "share a 'factual predicate' with the claims pled in the complaint." Does 1-2, 925 F.3d at 900.

### c. Attorneys' Fees

When a proposed settlement of FLSA claims includes the payment of attorneys' fees, the court must assess the reasonableness of the fee award. See Hawkins v. Accurate Nursing

41

Servs., Inc., 2020 WL 1031530, at *1 (N.D. Ohio Mar. 3, 2020);
see also 29 U.S.C. § 216(b) (providing that, in an FLSA action,
the court "shall, in addition to any judgment awarded to the
plaintiff or plaintiffs, allow a reasonable attorney's fee to be
paid by the defendant, and costs of the action").   When a
settlement produces a common fund for the benefit of the entire
class, courts may employ either the lodestar method (the product
of the number of hours reasonably spent on the case by an attorney
times a reasonable hourly rate), see Smith v. Serv. Master Corp.,
592 F. App'x 363, 369 (6th Cir. 2014) (citation omitted), or the
percentage-of-recovery method, see Rawlings v. Prudential-Bache
Props., Inc., 9 F.3d 513, 515-16 (6th Cir. 1993), to determine
whether an attorneys' fee is reasonable.   Brandenburg v. Cousin
Vinny's Pizza, LLC, 2019 WL 6310376, at *5 (S.D. Ohio Nov. 25,
2019).   Although in this Circuit, in the class action and
collective action context, "[i]t is not abnormal for negotiated
attorneys' fee awards to comprise 20% to 30% of the total award,"
see Does 1-2, 925 F.3d at 898 (citations omitted); see also
Rembert v. A Plus Home Health Care Agency LLC, 2020 WL 1443041,
at *3 (S.D. Ohio Mar. 25, 2020) (noting that judges in this
Circuit typically approve fees in the 25% to 35% range for FLSA
collective actions), a fee that falls within this range is not
automatically reasonable.   See Douglas, 371 F. Supp. 3d at 84-
85.

In determining the reasonableness of an attorneys' fee, the Court considers such factors as: "(1) the value of the benefit rendered for the class, (2) society's stake in rewarding attorneys who produce such benefits, (3) whether the services were undertaken on a contingent fee basis, (4) the value of the services on an hourly basis, (5) the complexity of the litigation, and (6) the professional skill and standing of the attorneys involved." Castillo, 2015 WL 13021899, at *6 (citations omitted).

"[A] district court must provide a concise but clear explanation of its reasons for the award." Smith, 592 F. App'x at 366 (citing U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1193 (6th Cir. 1997)). "To justify an award of attorneys' fees, the party seeking compensation bears the burden of documenting its work." Crawford, 2008 WL 4724499, at *12 (citing Gonter v. Hunt Valve Co., 510 F.3d 610, 617 (6th Cir. 2007)). A court carefully reviews the award of attorneys' fees for "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011) (citations omitted). Those "subtle signs" include: (1) a disproportionate award to counsel; (2) a "clear sailing" arrangement for attorneys' fees; and (3) arrangements where fees not awarded revert to defendant

43

rather than the class fund.[8]  See id.  (citations omitted); see also 2 Joseph M. McLaughlin, McLaughlin on Class Actions § 6:4 (16th ed. 2019) ("warning signs").

Plaintiffs' counsel asks to be awarded "an amount not to exceed $292,500 from the Manager Fund and $149,750 from the Non-Manager Fund" for attorneys' fees and costs.  (ECF No. 14-1 ¶ 5.5.)  The total amount is less than 30% of the Gross Settlement Amount.  (See id. ¶¶ 4.1, 5.5.)  The amount is not contingent on how many plaintiffs opt into the litigation or on how much plaintiffs actually recover.  The parties do not brief, argue, or submit evidence about why and how these fees are reasonable.  The First Amended Settlement Agreement represents that they "are a fair and reasonable amount," were "necessary for the prosecution of this Action," and were "separately negotiated with the help of a third party Mediator, and only after the amounts to the Plaintiffs were agreed upon."  (Id. ¶ 5.5.) Plaintiffs' counsel has not provided any detailed descriptions of tasks completed, hours spent on each task, who performed the work, each person's hourly rate or the total number of hours worked.   It is the plaintiffs' burden to offer sufficient

---

[8] Although those signs are normally analyzed in the class action context, they are applicable and informative in considering whether attorneys' fees are reasonable in the collective action context.

evidence to allow the district court to review the reasonableness of any attorneys' fees.  See UAW, 497 F.3d at 635.

The Court has insufficient information to determine whether the proposed fees are reasonable.  See Tapia v. Mount Kisco Bagel Co., 2018 WL 4931542, at *4 (S.D.N.Y. Oct. 5, 2018) ("Based on the evidence before it, . . . the Court is unable to say whether the requested 30.26% contingency fee is reasonable in this particular case because Plaintiffs['] counsel have not provided the Court with affidavits attesting to their hourly rate or contemporaneous time records indicating the actual amount of hours worked."); Bhardwhaj v. Alan's Farmland Ltd., 2018 WL 1891313, at *2 (S.D.N.Y. Apr. 5, 2018) ("[C]ourts . . . use the lodestar as a 'cross check' to determine the reasonableness of attorney's fees.  However, here Plaintiffs['] counsel has not provided any records of the hours spent working on the case or the rates at which they bill.  As a result, the Court has insufficient information with which to assess the reasonableness of the request for attorney's fees[.]") (citing Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 123 (2d Cir. 2005)); Williams, 2016 WL 6405798, at *4 ("Plaintiffs also have not provided the Court with adequate information to assess the reasonableness of the attorney's fee award.").  When counsel asks the Court to approve attorneys' fees, counsel must submit

sufficient information to allow the Court to review the reasonableness of those fees. See UAW, 497 F.3d at 635.

There are "subtle signs" that the fees requested in this case might not be reasonable. See In re Bluetooth, 654 F.3d at 946. A "clear sailing" clause is a clause providing that a "defendant agrees not to oppose a petition by plaintiff's counsel for a fee award up to a specified maximum figure." McLaughlin, § 6:4. This Circuit has not held that clear sailing clauses are unlawful per se, but has recognized that their inclusion in a settlement agreement imposes on district courts a heightened duty to review the fee request and to closely scrutinize the relationship between the fees and the benefit to the collective action. See Gascho v. Glob. Fitness Holdings, LLC, 822 F.3d 269, 291 (6th Cir. 2016) (citation and quotation marks omitted). The First Amended Settlement Agreement contains a clear sailing clause: "Victra does not oppose Plaintiffs' counsel's recovery of these fees or expenses and does not object to the reasonableness of the Attorneys' Fees and Expenses, or that they were fair, reasonable, and necessary for the prosecution of this Action." (ECF No. 14-1 ¶ 5.5.) The inclusion of that clause suggests the potential unreasonableness of the fees.

A "kicker" clause is a clause providing "that if the court reduces the amount of class counsel's requested fee, the difference reverts to the defendant and is not distributed to

46

class members." McLaughlin, § 6:4.  Courts are wary of kicker clauses governing attorneys' fees because they "amplif[y] the danger of collusion already suggested by a clear sailing provision[.]" In re Bluetooth, 654 F.3d at 949.  In addition to being wary of kicker clauses governing attorneys' fees, courts have been wary of those clauses governing unclaimed settlement funds.  See, e.g., Smothers, 2019 WL 280294, at *13 ("[C]ourts are also wary of settlement agreements that would return all unclaimed settlement funds to the defendant.") (citing Trout v. Meggitt-USA Servs., Inc., 2018 WL 1870388, at *6 (C.D. Cal. Apr. 17, 2018) (noting such reversionary provisions are "strongly disfavored" and parties must satisfactorily "explain why those funds should revert") (citations omitted)); Khanna, 2012 WL 4465558, at *11 ("When a statute's objectives include deterrence, as does the FLSA's, it would contradict these goals to permit the defendant to retain unclaimed funds.") (citation and quotation marks omitted).

The First Amended Settlement Agreement contains reversionary provisions governing unclaimed settlement funds. (ECF No. 14-1 ¶ 3.3) ("The Settlement Administrator shall return to Victra any unclaimed or remaining amounts in the Qualified Settlement Fund at the end of the Opt-In Period . . . ."); (id. ¶ 6.5) ("In the event that any Potential Opt-In Plaintiff does not cash the check distributed by the Settlement Administrator

to him or her within the 90-day period and there is no request
for a new check within thirty (30) days after such check was
issued, the money allocated to such Potential Opt-In Plaintiff
shall be reallocated and redistributed to Victra."). The
inclusion of those clauses suggests the potential
unreasonableness of the Settlement Agreement and the award of
attorneys' fees. See Smothers, 2019 WL 280294, at *13.

For the reasons stated, the parties' Motion for Settlement
Approval and Motion for Approval of First Amendment to Settlement
are DENIED.

### B. Motions to Intervene

The Hardney Intervenors, Baggott, and Solorio and Diaz move
for both mandatory and permissive intervention under Rule 24.
Fed. R. Civ. P. 24(a)-(b). Mandatory intervention requires them
to establish that: (1) they timely moved to intervene; (2) they
have a substantial legal interest in the case; (3) their ability
to protect their legal interest will be impaired in the absence
of intervention; and (4) the representation of the parties
already before the court is inadequate. Stupak-Thrall, 226 F.3d
at 471. The failure to satisfy any one of these elements is
sufficient to deny their motions. See Michigan, 424 F.3d at 443.

This Circuit has a "rather expansive notion" of what
constitutes a legal interest under Rule 24. Mich. State AFL-
CIO, 103 F.3d at 1245. A putative intervenor must show only

that "impairment of its substantial legal interest is possible
if intervention is denied." Grutter, 188 F.3d at 399. The
burden of proof is "minimal." Id. Courts have found that, "when
a [putative] intervenor is a member of a putative class and seeks
to challenge a proposed settlement agreement, the intervenor's
interest would not be impaired if the agreement allows him or
her to opt out of the settlement." See, e.g., Swinton v.
SquareTrade, Inc., 2018 WL 8458862, at *4 (S.D. Iowa Sept. 21,
2018) (collecting cases); see also Altier v. Worley Catastrophe
Response, LLC, 2012 WL 161824, at *11 (E.D. La. Jan. 18, 2012)
("Regardless of the decisions of any plaintiffs regarding
settlement in the instant cases, those who do not participate
and are putative members of the [intervening collective action]
can still pursue their claims in the [other] litigation, which
is the only interest that they have.").

The Hardney Intervenors, Baggott, and Solorio and Diaz may
not intervene as a matter of right because their ability to
protect their legal interests will not be impaired by their
inability to intervene.

The Hardney Intervenors argue that they have a legal
interest in this case because the First Amended Settlement
Agreement "seeks to settle the off-the-clock claims of the
Hardney plaintiffs and putative collective class, clearly giving
the Hardney Intervenors a substantial interest in the settlement

approval before the Court." (ECF No. 15 at 13.) The Hardney Intervenors argue that, "[b]ecause [the Settlement Agreement] seeks to include the off-the-clock claims of [retail sales managers] within its parameters, the [Settlement Agreement] unquestionably would impair the legal interests of the Hardney plaintiffs and collective class." (Id. at 13-14.)

Baggott argues that his legal interest is that he is "a member of the proposed collective action in this lawsuit and would be affected by the proposed settlement even if he cashed the check he received by mistake." (ECF No. 40 at 4-5.) He argues that he has a legal interest in preventing the stay of a similar action brought in the Eastern District of North Carolina, "which would delay [] vindication of his legal rights . . . ." (Id. at 5.) He argues that this Court's approval of the Settlement Agreement "is likely to decrease the number of individuals eligible to join [his] proposed FLSA collective and Rule 23 class actions in [his] North Carolina action, and thereby jeopardiz[es] [his] potential recovery of a larger class representative incentive award in the Eastern District of North Carolina lawsuit." (Id. at 6.)

Solorio and Diaz argue that the First Amended Settlement Agreement "seeks to release all known or unknown wage and hour claims under both state and federal law, wholly encompassing the California wage and hour claims at issue in the Solorio Action."

(ECF No. 57 at 7.)  They argue that "[p]lainly, Intervenors have a substantial interest in these claims."  (Id.)

Assuming without deciding that the Hardney Intervenors, Baggott, and Solorio and Diaz have substantial legal interests in this case, none of those assumed legal interests would be impaired by denying intervention at this time.  To the extent that the Hardney Intervenors and Solorio and Diaz have brought the same or substantially similar claims in different actions, and that their claims in those actions could be barred by the Court's approval of the First Amended Settlement Agreement, the Court has declined to approve that Agreement.  There is no present possibility that any legal rights would be barred.

This action is a putative collective action in which the parties are not bound unless they opt in.  The Hardney Intervenors and Solorio and Diaz will retain their full rights if they decide not to opt in.[9]  See Franklin Cty. v. Travelers Prop. Cas. Ins. Co. of Am., 2008 WL 4787401, at *3 (E.D. Ky. Oct. 30, 2008) (denying mandatory intervention on ground that the legal interests of the putative intervenors, who were concurrently seeking similar relief in other federal and state

---

[9] That the Hardney, Baggott, and Solorio and Diaz actions are styled class actions and that the rights of absent members might be impaired is not persuasive because none of those actions has been certified as a class action.  Therefore, there are no absent members.  See Altier, 2012 WL 161824, at *11.

courts, would not be impaired because their ability to bring separate actions would not be affected by the resolution of the underlying case); Altier, 2012 WL 161824, at *11; cf. Swinton, 2018 WL 8458862, at *4.

Baggott's legal interest in avoiding cashing a check by mistake cannot be infringed because the Court has declined to approve the parties' First Amended Settlement Agreement and no checks will be mailed.  Baggott's legal interest in preventing a stay is not infringed because the Court has declined to approve the First Amended Settlement Agreement and, as Baggott recognizes, VICTRA "no longer [has] any basis to rely on the proposed settlement agreement in this lawsuit to argue for a stay of the North Carolina lawsuit." (ECF No. 40 at 5.) Because the Court has declined to approve the First Amended Settlement Agreement, the number of individuals eligible to join Baggott's Action remains unchanged.  Because the Hardney Intervenors, Baggott, and Solorio and Diaz cannot satisfy one of the mandatory criteria for intervention as a matter of right, the Court DENIES their request for mandatory intervention.  See Michigan, 424 F.3d at 443.

Addressing permissive intervention, the Hardney Intervenors represent that "[t]he purpose of the[ir] intervention is to object to the FLSA settlement in this case[.]" (ECF No. 15 at 1.)  Baggott represents that he seeks "to intervene in this

lawsuit for the limited purpose of filing a written objection to the proposed settlement[.]" (ECF No. 39 at 1.) Baggott represents that "[h]e is seeking to intervene for the sole purpose of filing with the Court a written objection to the settlement that is less than ten pages long[,]" "[h]e is not seeking to take any discovery, or to undertake any other steps to delay the Court's resolution of the parties' motion for settlement approval," and "he has no intention of opting into the settlement for this case." (ECF No. 40 at 4, 11.) Solorio and Diaz represent that "[t]he purpose of this intervention is to object to the FLSA settlement in this case[.]" (ECF No. 57 at 2.)

The Court has denied the parties' Motion for Settlement Approval. Because the Hardney Intervenors, Baggott, and Solorio and Diaz represent that their purpose in seeking to intervene is to object to the parties' First Amended Settlement Agreement, and because the Court has denied the parties' Motion for Settlement Approval, the Court exercises its discretion not to allow permissive intervention at this time. See In re Telectronics Pacing Sys., Inc., 221 F.3d at 882 (one factor in determining whether a motion to intervene is timely is "the purpose for which intervention is sought"); see also United States v. Tennessee, 260 F.3d 587, 593 (6th Cir. 2001) (purpose of intervention to have "the opportunity to be an active party

in future remedial proceedings" "weigh[ed] against a finding of timely intervention").

## V.    Conclusion

For the foregoing reasons, the parties' Motion for Settlement Approval is DENIED.  The Hardney Motion, the Baggott Motion, and the Solorio and Diaz Motion are DENIED WITHOUT PREJUDICE.


So ordered this 4th day of August, 2020.

/s/ *Samuel H. Mays, Jr.*
SAMUEL H. MAYS, Jr.
UNITED STATES DISTRICT JUDGE