**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **JACOB O'BRYANT et al.,** | ) | **Civil No. 2:19-cv-02378-SHM-tmp** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **JURY DEMAND** |
| **v.** | ) | |
| | ) | |
| **ABC PHONES OF NORTH CAROLINA,** | ) | |
| **INC., d/b/a VICTRA, f/d/b/a A Wireless,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## JOINT MOTION & INCORPORATED MEMORANDUM FOR PRELIMINARY APPROVAL OF AMENDED SETTLEMENT

Following arms-length negotiations and mediation, Plaintiffs Jacob O'Bryant and Mark Baker ("Plaintiffs"), and Defendant ABC Phones of North Carolina, Inc. d/b/a VICTRA ("Victra" or "Defendant," and collectively, "the Parties") have reached a proposed settlement in the above-captioned case. The terms of the proposed settlement are set forth in the Amended Settlement and Release Agreement attached hereto as Exhibit 1 ("Amended Settlement Agreement").[1] The Parties respectfully request that the Court grant preliminary approval of their proposed settlement of this Fair Labor Standards Act ("FLSA") collective action seeking overtime compensation, so that notice can be issued to Potential Opt-In Plaintiffs. As detailed below, the Court should grant the Parties' Motion because this settlement is a fair, adequate, and reasonable resolution of the Parties' *bona fide* dispute as to liability and damages under the

---

[1] Any capitalized terms not defined herein have the meanings ascribed in the Amended Settlement Agreement. All references to paragraph numbers made herein refer to the corresponding section within the attached Amended Settlement Agreement.

FLSA. The Parties have negotiated several changes to the structure of their settlement to align with the Court's August 4, 2020 order, including: (1) providing for a two-stage approval process, (2) providing notice to Potential Opt-Ins after preliminary settlement approval, (3) filing opt-in consents with the Court prior to final settlement approval, (4) issuing settlement checks after final approval, (5) better explaining the scope of the releases applicable to Plaintiffs and Opt-In Plaintiffs, and (6) providing for the reversion of a portion of any Unapproved Fee Amount to each Opt-In Plaintiff in accordance with their Pro Rate Share of the Manager Maximum Settlement Amount or the Non-Manager Maximum Settlement Amount.

## BACKGROUND

**I.      Plaintiff's Lawsuit.**

On June 10, 2019, Named Plaintiffs, individually and on behalf of all other "similarly-situated" individuals, filed a collective action lawsuit against Defendant. (ECF No. 1.) On September 9, 2019, Plaintiffs filed their First Amended Complaint. (ECF No. 12.) On August 11, 2020, Plaintiffs filed their Second Amended Complaint, which is the operative complaint. (ECF No. 67.) The Second Amended Complaint identifies two groups of allegedly-similarly-situated individuals: (1) all current and former retail managers of Victra who were paid an hourly wage plus commission and who were employed in the United States during the statutory period, and (2) all current and former retail employees of Victra who were paid an hourly wage plus commission and who were employed in the United States during the statutory period. (ECF No. 67 ¶¶ 4-5.)

**II.     Defendant Produced Substantial Data, Which Were Analyzed by Plaintiffs' Counsel.**

After the Original Complaint was filed, the Parties agreed to attempt to mediate this dispute on August 21, 2019. In preparation for the mediation, the Parties conducted informal

discovery and investigation of the facts and law. Specifically, Defendant produced, for settlement purposes only and as a show of an intent to negotiate in good faith, over 400,000 payroll records containing 24 variables related to the Named Plaintiffs and putative members of the collective. These payroll records contained hours and wage information spanning more than three years of pay periods, including regular hours and pay, overtime hours and pay, commissions and special incentive payments, extra unearned overtime payments, and other payroll components. Personally identifying information was removed from the data, and a randomly assigned employee ID was provided as a proxy to allow Plaintiffs' Counsel to analyze the records and attempt to estimate any potential damages for Plaintiffs' claims on a per employee basis. Relying on their investigations and analysis of applicable law, the Parties have engaged in arm's length settlement negotiations.

## III.    **Mediation.**

On August 21, 2019 the Parties participated in mediation with Michael Russell and were successful in reaching a tentative resolution as to Defendant's Store Managers.[2] At the mediation, Defendant disputed the merits of Plaintiffs' claims and emphasized its belief that the enforceable arbitration agreements between the Parties precluded Plaintiffs from pursuing their claims on a class or collective basis. Plaintiffs maintained their position that the claims had merit and would be pursued through litigation or arbitration if a settlement were not reached. As noted above, to avoid the time, costs, and resources of resolving this dispute through litigation or arbitration, the Parties reached a tentative agreement to settle the claims of the Store Managers.

---

[2] Through informal discovery conducted prior to the mediation Plaintiffs learned that an enforceable arbitration agreement including a class waiver exists between Defendant and the Named Plaintiffs and the putative members of the collective (the "Arbitration Agreement").

In the weeks after the August 21, 2019 mediation, the Parties were able to reach a resolution as to Defendant's Non-Managers.

**IV.    The Initial Settlement Agreement and Amendment.**

Following the mediation, the Parties worked together to negotiate the additional terms of their settlement agreement, such as the administration of the individual settlement payments, the language to be included in the notice to Potential Opt-In Plaintiffs, the service awards for Named Plaintiffs, and the maximum amount of attorneys' fees, costs, and expenses to be paid to Plaintiffs' counsel by Victra upon approval by the Court. After such negotiations, the Parties agreed upon the Settlement and Release Agreement filed September 9, 2019 ("Initial Settlement Agreement") in conjunction with the Joint Motion for Settlement Approval. (ECF No. 14.)

During the pendency of the Joint Motion for Settlement Approval, the Parties negotiated the First Amendment to Settlement, filed July 3, 2020, in conjunction with a Joint Motion for Approval. (ECF No. 58.) The revised settlement provided further benefits to the Plaintiffs in the amount of $190,888, extended the Applicable Class Period to May 30, 2020, and made clear that, consistent with California law, the settlement did not intend to release any claims under the Private Attorneys General Act ("PAGA"), as provided in Cal. Labor Code § 2699, *et seq*.

**V.    The Court's August 4, 2020 Order and Amended Settlement Agreement.**

On August 4, 2020, the Court issued an Order denying the pending Joint Motion for Settlement Approval and Joint Motion for Approval of First Amendment to Settlement and Release Agreement (the "Order"). Since that date, the Parties have negotiated changes to the structure of their settlement and the terms of the Initial Settlement Agreement, which have been memorialized in the Amended Settlement Agreement, attached hereto as Exhibit 1. In addition, prior to the filing of this Joint Motion, the Parties filed a Stipulated Motion and Incorporated

Memorandum for Conditional Certification of the Collective Encompassed by the Parties'

Settlement (ECF No. 68), in which they stipulate to and request conditional certification of the

defined collective.  This structure allows the Court to evaluate the settlement with all Opt-In

Plaintiffs before the Court.

The following modifications, among others, have been incorporated in the Amended

Settlement Agreement to address the points raised in the Order:

1.  **Two-Step Approval.**  The Amended Settlement Agreement provides for a two-step approval process, in which the Parties first seek preliminary approval of the settlement, after which notice will be sent to Potential Opt-In Plaintiffs.  After all Opt-In Plaintiffs have joined the collective action, the Parties will then seek final approval of the settlement.  Under this two-step process, neither the limited release applicable to Opt-In Plaintiffs nor the dismissal of the action would become effective until the Court issues a Final Approval Order.

2.  **Notice.**  The Amended Settlement Agreement provides that the notice to Potential Opt-In Plaintiffs will inform them of the minimum estimated settlement payment they will receive if they opt-in to the settlement and the settlement receives final approval from the Court.  Such notice also informs the Potential Opt-In Plaintiffs of the limited scope of the release that will bind them if they opt in to the settlement and provides them with a Consent Form they can complete and submit to become Opt-In Plaintiffs.

3.  **Consent Forms.**  The Amended Settlement Agreement provides for the Potential Opt-In Plaintiffs to complete and submit opt in Consent Forms either electronically or by mail, which will be subsequently filed with the Court.  This mechanism ensures that all of the Opt-In Plaintiffs are properly before the Court prior to the Court granting final approval of the settlement.

4.  **Payment after Opt-In Process.**  The Amended Settlement Agreement provides for settlement checks to be issued to Opt-In Plaintiffs after their written Consent Forms have been filed with the Court and after entry of a Final Approval Order.  As stated, prior to issuance of settlement checks, the minimum estimated amount of the individual settlement compensation will have already been disclosed to each Opt-In Plaintiff on the Notice distributed to each.

5.  **The Releases.**  The scope of the release applicable to Opt-In Plaintiffs in the Amended Settlement Agreement is limited to only claims arising under the FLSA that relate to the payment or non-payment of (1) overtime wages, including the calculation of overtime wages, or (2) compensation for off-the-clock work as

asserted in the Second Amended Complaint.[3]  As explained below, this language
makes clear that the Released Claims share a factual predicate with the allegations
made by Plaintiffs.   The Amended Settlement Agreement clarifies that the
separate general release executed by the Named Plaintiffs is applicable to the
Named Plaintiffs only and does not bind any of the Opt-In Plaintiffs.

6.      **Attorneys' Fees.**  The Amended Settlement Agreement provides that Plaintiffs'
counsel will seek approval from the Court for its Attorneys' Fees and Expenses in
an amount not to exceed $442,250, and that any Unapproved Fee Amount shall be
divided in two parts, for the Store Manager Collective and the Non-Manager
Collective, and such amounts shall be distributed to Opt-In Plaintiffs in
accordance with their Pro Rata Share of the Manager Maximum Settlement
Amount or the Non-Manager Maximum Settlement Amount.

In addition, although not addressed in the Court's Order, the Parties negotiated further

benefits to the Potential Opt-In Plaintiffs.   In the wake of the Order, the Parties closely

scrutinized the distribution of available payments among the Potential Opt-In Plaintiffs, and

determined that certain other changes in the calculation and structure of payments under the

settlement would result in increased benefits to the collective.   These additional benefits include

the following:

1.      **More money.**  Victra has increased the amount of money it is paying to resolve
claims by approximately $147,000 (the "Additional Funds").   These Additional
Funds allow the Applicable Collective Period to be brought forward from May
2020 to August 7, 2020.[4]

2.      **Base Payments to Every Opt-In Plaintiff.**  The Additional Funds also enable
every Opt-In Plaintiff to receive a Base Payment of at least $10.00, and at most
$25.00, depending on the number of Opt-In Plaintiffs, from a Base Settlement
Amount of $213,560.00.   This Base Payment is intended to compensate Opt-In
Plaintiffs for the time and effort to opt into the settlement, as well as provide
additional compensation for potential off-the-clock damages, which are inherently
difficult to estimate.   Should any portion of the Base Settlement Amount not be

---

[3] On August 11, 2020, Plaintiffs filed a Second Amended Complaint, which adds allegations to
make it clear that Plaintiffs' intent was to allege all claims to be released in the Amended
Settlement Agreement.  Indeed, it was always the intent of the Parties to settle and release all
such claims as articulated in the Joint Motion for Settlement Approval.

[4] Together with the additional $190,888 negotiated in the First Amendment to Settlement, the
Parties have agreed to a total $337,880 in excess consideration for the Collective since the Initial
Settlement Agreement was reached.

paid out in Base Payments, the remaining balance of the Base Settlement Amount
will be distributed to Opt-In Plaintiffs in accordance with their pro-rata recoveries
from the settlement.

3. **<u>Revised Calculations.</u>** The Parties have agreed to revised calculations of the
amount of money to be provided to Opt-In Plaintiffs. Previously, an Opt-In
Plaintiff was required to work a minimum of 5 days in a week to qualify for
payments; under the revised calculations, an Opt-In Plaintiff receives
compensation if they worked 4 days in a week, and qualifies for increased
payments the more days he or she worked in a given workweek. These changes
reflect that it is more likely for an individual to have a greater potential claim for
damages the more days the individual works in a week.

4. **<u>Cy Pres of Uncashed Checks.</u>** The amount of any checks that remain uncashed
by Opt-In Plaintiffs shall be donated to a nonprofit charitable organization that
benefits Victra employees to be identified in the Parties' request to enter the Final
Approval Order.

Counsel for the Parties concur that the Amended Settlement Agreement is fair and
reasonable under the circumstances, especially in light of the Arbitration Agreement that exists
between the Parties (and that would also cover and apply to putative members of any collective),
the risk of decertification, and the likely amount of damages that could be sought at trial. If the
Court grants preliminary approval of the Amended Settlement Agreement, the Parties will
commence with distributing the Notices of FLSA Settlement to each Potential Opt-In Plaintiff.
If the Court does not approve the Amended Settlement Agreement, Defendant intends to
immediately move to compel this dispute to individual arbitration.

## <u>ARGUMENT</u>

The Parties have reached a settlement agreement that fairly and reasonably resolves the
Parties' claims and defenses. The Court should enter an order granting preliminary approval of
the settlement so that the putative members of the collective may be given the opportunity to opt
in and receive a settlement payment without the need for both parties to expend significant time
and resources arbitrating their disputes in individual arbitrations.

I.      **The Proposed Settlement Appropriately Resolves the Parties' Claims and Defenses.**

    A.      **Standard for Approval of Settlement of FLSA Collective Actions.**

Employees can settle and release claims under the FLSA in two ways.  First, the FLSA allows employees to settle and waive their claims if the payment of unpaid wages by the employer to the employee is supervised by the Secretary of Labor.  *See* 29 U.S.C. § 216(c); *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982).  Second, in the context of a private lawsuit brought by an employee against an employer under § 216(b), an employee may settle and release FLSA claims against an employer if the parties present the district court with a proposed settlement, and the district court enters a stipulated judgment approving the fairness of the settlement.  *Id.*

In reviewing a settlement of a private FLSA claim, the Court must scrutinize the proposed settlement for fairness and determine whether the settlement is a "fair and reasonable resolution of a bona fide dispute over FLSA provisions."  *Lynn's Food Stores, Inc.*, 679 F.2d at 1355; *see also Doe 1-2 v. Deja Vu Servs., Inc., No. 2:16-CV-10877, 2017 WL 2629101, at *8 (E.D. Mich. June 19, 2017), aff'd sub nom. Does 1-2 v. Deja Vu Servs., Inc., 925 F.3d 886 (6th Cir. 2019); Bartlow v. Grand Crowne Resorts of Pigeon Forge*, No. 11-400, 2012 WL 6707008, at *1 (E.D. Tenn. Dec. 26, 2012); *Simmons v. Mathis Tire & Auto Serv., Inc.*, No. 13-2875, 2015 WL 5008220, at *1 (W.D. Tenn. Aug. 20, 2015).  A settlement that "reflect[s] a reasonable compromise over issues, such as FLSA coverage or computation of back wages[] that are actually in dispute"  meets this test of resolving a "bona fide dispute."  *Lynn's Food Stores*, 679 F.2d at 1354; *accord Alvarez v. BI Inc.*, 2020 WL 1694294, at *4 (E.D. Pa. Apr. 6, 2020).

### B.    A *Bona Fide* Dispute Exists Over Liability and Damages.

In reviewing the settlement of a plaintiff's FLSA claims, the district court must "ensure that the parties are not, via settlement of the claims, negotiating around the clear FLSA requirements of compensation for all hours worked, minimum wages, maximum hours, and overtime." *Rotuna v. W. Customer Mgmt. Grp. LLC*, No. 09-1608, 2010 WL 2490989 at *5 (N.D. Ohio June 15, 2010) (quoting *Collins v. Sanderson Farms, Inc.*, 568 F.Supp.2d 714, 719 (E.D.La.2000)).  The existence of a *bona fide* dispute serves as a guarantee that the parties have not manipulated the settlement process to permit the employer to avoid its obligations under the FLSA.  *Id.*; *Ochs v. Modern Design, Inc.*, No. 14-635, 2014 WL 4983674, at *2 (N.D. Ohio Oct. 6, 2014).

A *bona fide* dispute exists in this case.  Victra asserted, and continues to assert, that it had reasonable grounds to believe it was in full compliance with the FLSA at all times and acted in good faith and not in violation—willful or otherwise—of the FLSA at any time relevant to this action.  In fact, it is undisputed that Victra paid overtime pay to the Plaintiffs and the putative members of the collective, *as well as extra unearned overtime payments* to the Store Managers. What is clearly in dispute is whether the overtime pay was calculated correctly and whether Store Managers or Non-Managers worked *additional* uncompensated hours and if so, whether Victra was aware of and/or responsible for the uncompensated hours.  *See Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016) ("A bona fide dispute exists when there are legitimate questions about 'the existence and extent of [d]efendant's FLSA liability.'") (quoting *Ambrosino v. Home Depot U.S.A., Inc.*, 2014 WL 1671489 (S.D. Cal. Apr. 28, 2014)).

Here there is a substantial dispute between the Parties about whether the overtime was calculated correctly and whether the alleged unpaid hours would be overtime hours and the amount, if any, of such overtime hours. Victra believes its policies comply with all applicable legal requirements that prohibit off-the-clock work, and that its personnel followed such policies at all times and that Plaintiffs and Potential Opt-In Plaintiffs had the obligation and ability to record all time worked; on the other hand, Plaintiffs contend that Victra's policies were not always followed in practice.

Under the FLSA, commissions are to be included in the calculation of regular rate for overtime on a per-workweek basis where *practicable*. 29 CFR § 778.120. However, if not practicable, 29 CFR § 778.120 allows for other methods of incorporating commissions into the regular rate calculation. Victra's position is that it is not obligated to allocate commissions on a per-workweek basis because it is not practicable to do so given the nature of Victra's business and the timing of commissions payments. As a result, Victra contends it properly calculated the regular rate by allocating equal amounts of commissions to each hour worked, in accordance with 29 CFR § 778.120(b), as is allowable when it is not practicable to allocate commissions on a per-workweek basis. Plaintiffs' position is that Victra does, or should, know the exact day an employee's commission was earned and that it is practicable to allocate commissions on a weekly basis, despite Victra's position that the requisite data does not exist or is otherwise impracticable to obtain for each Plaintiff and Potential Opt-In Plaintiff.

In addition, Victra asserts that the arbitration agreements executed by the Plaintiffs and putative members of the collective are enforceable, and under them, each Plaintiff and putative member could be compelled to individual arbitration. Although Plaintiffs' counsel believes that Plaintiffs and the collective could potentially recover several million dollars if they were able to

litigate this matter on a collective basis, Plaintiffs' counsel recognizes that there is a considerable risk that putative members of the collective would never recover anything on a collective (or group) basis—or even have the option of participating in these proceedings—if Victra is able to successfully compel individual arbitrations,[5] and that risk was taken into consideration in coming to an agreement regarding the settlement amount.

Although Victra has been willing to stipulate to conditional certification for the purposes of settlement only, if settlement is unsuccessful, Victra disputes the Plaintiffs' ability to establish that they are "similarly situated" to the putative members of the collective—and that within the collective, putative members could be "similarly situated"—due to the different job responsibilities and compensation structure of Store Managers and Non-Managers across different stores and geographic locations, different applicable commissions programs, and that any deviation from Victra's policies prohibiting off-the-clock work would be due to improper ad-hoc actions of supervisors that would necessarily require individualized inquiry and defeat certification of any kind. The Parties both agree that there is substantial risk for both sides.

The total settlement amount reflects a reasonable compromise of the claimed damages and confers substantial benefits upon each of the Named Plaintiffs and the putative members of the collective, especially in light of the arbitration agreements. Although the Parties continue to firmly believe in the merits of their respective claims and defenses, given the time and expense associated with full-blown litigation and potentially hundreds of individual arbitrations, the Parties agree that a compromise is appropriate at this stage of the litigation. They desire to resolve this case by way of a negotiated settlement payment by Defendant in exchange for a

---

[5] *See, e.g., Simon v. Pfizer Inc.*, 398 F.3d 765, 773 (6th Cir. 2005) (A "compulsory arbitration provision divests the District Court of jurisdiction" over claims within the scope of it.) (citing *United Steelworkers v. Mead Corp.*, 21 F.3d 128, 132-33 (6th Cir. 1994)).

release of claims so as to avoid the time and expense inherent in continued litigation and protracted individual arbitrations. *See Lynn's Food Stores*, 679 F.2d at 1354 ("Thus, when the parties [to the litigation] submit a settlement to the court for approval, the settlement is more likely to reflect a reasonable compromise of disputed issues than a mere waiver of statutory rights brought about by an employer's overreaching.").

      **C.**    **The Amended Settlement Agreement is Fair and Reasonable.**

                **1.**    <u>The Procedure Outlined in the Amended Settlement Agreement Comports With the Court's Requirements.</u>

                    *a.*    *Two-Stage Certification*

First, the Parties have agreed, for the purposes of settlement, to stipulate to conditional certification of the collective action at this stage, so that the Court can, in preliminarily approving the amended settlement, "authorize notice to possible collective members who may want to participate." (Order at 14; *see* Stipulated Motion and Incorporated Memorandum for Conditional Certification of the Collective Encompassed by the Parties' Settlement, ECF No. 68.) This two-stage certification process is reflected throughout the Amended Settlement Agreement, *see, e.g.*, Paragraph 4.4, which provides for the Court to make its final determination on final approval of the settlement only after the notice and opt-in procedures have been completed.

                    *b.*    *Two-Stage Preliminary and Final Approval of Settlement*

Second, the proposed two-stage settlement approval goes hand-in-hand with the two-stage certification. As provided in Paragraphs 4.1 and 4.2, the Parties seek preliminary approval of the Amended Settlement Agreement, such that all Potential Opt-In Plaintiffs will be provided notice and the opportunity to file opt in consents with the Court. This procedure addresses the Court's concern that final approval of the settlement should not take place before Opt-in

Plaintiffs "have appeared or had the opportunity to be heard." (Order at 32.) Preliminary approval of the Amended Settlement Agreement is sought at this time to facilitate notice to Potential Opt-in Plaintiffs and establish the structure of the settlement process. Only upon entry of a Final Approval Order, for which the Parties will move the Court at a later time, will the Plaintiffs' limited releases become effective. (*See* Paragraph 4.5.)

c.     *Notice and Opt-in Procedure*

Third, Paragraph 6.2 provides for the Notice to be distributed to all Potential Opt-In Plaintiffs following the Court's preliminary approval of the Amended Settlement Agreement. This Notice will specify the minimum estimated Individual Settlement Payment for the corresponding Potential Opt-In Plaintiff, provide information on how the Potential Opt-In Plaintiff may consent to join the collective action, and inform Potential Opt-In Plaintiffs of the release they will be bound by if they opt in. (*See* Paragraph 6.2.) To address the Court's concern to ensure that all Opt-In Plaintiffs are "bound by the results of the litigation," the Amended Settlement Agreement provides that the Consent Forms shall be filed with the Court within sixty days of the conclusion of the opt-in period. (Order at 15; *see* Amended Settlement Agreement Paragraph 6.2.) This mechanism provides that all of the Opt-In Plaintiffs are properly before the Court prior to the Parties moving for final approval of the settlement. (*See* Order at 32.) Moreover, the limited release language which Opt-In Plaintiffs will ultimately agree to will no longer be included on settlement checks; rather, the release language will be disclosed in the Notice as well as in the Consent Form and will not become effective until the entry of a Final Approval Order. (*See* Exhibits A and D to Exhibit 1.)

d.    *Ancillary Jurisdiction*

Fourth, to address justiciability issues and limit the scope of the Court's use of ancillary jurisdiction, such that the Court would only be required later, if at all, "to enforce the terms of the settlement agreement," the Parties have agreed to seek dismissal of the litigation with prejudice only after all Opt-In Plaintiffs have opted into the collective and filed consents, and only after the Court has granted final approval of the settlement.  (Order at 33; *see* Amended Settlement Agreement Paragraphs 9.1 and 11.1.)

2.    The Total Maximum Settlement Amount and Individual Settlement Payments Are Fair and Reasonable in Light of the Significant Hurdles to Recovery.

The Total Maximum Settlement Amount is fair and reasonable in light of the significant hurdles to recovery, most notably the challenges in securing conditional and final certification due to the arbitration agreements and issues with establishing that the putative collective is "similarly situated," and the estimated potential damages amounts.

Plaintiffs face hurdles to conditional certification, unless Victra stipulates *for settlement purposes only* that the putative collective action is "similarly situated" within the meaning of 29 U.S.C. § 216(b).  Plaintiffs appreciate the significant hurdles to securing conditional certification due to what Victra contends is Plaintiffs' inability to show that the putative collective action was subject to a single unlawful decision, policy, or plan common to the entire collective and because of Victra's enforceable arbitration agreements with collective and class action waivers,.

First, Victra disputes Plaintiffs' ability to establish with legally competent evidence that the putative members of the collective were all subject to a single unlawful decision, policy, or plan so as to be "similarly situated."  *See, e.g.*, *Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 961 (W.D. Mich. 2009) ("[C]ourts have consistently required the plaintiffs to

show that the class members were together the victims of 'a single decision, policy, or plan' before they will certify a collective action.") (citing cases).

Second, Victra asserts that the arbitration agreements with collective and class action waivers executed by Plaintiffs, as well as putative members of the collective are enforceable, and as such, at a minimum, each Plaintiff should be compelled to individual arbitration. Plaintiffs are aware that absent Victra's stipulation, they may never be able to maintain a collective (or class) of any kind comprised of individuals covered by enforceable arbitration agreements with class and collective action waivers.[6] For the following reasons, it is Victra's position that its policies and practices undercut Plaintiffs' ability to secure and thereafter maintain certification of their putative collective action.[7]

> a. *Victra's Position is that Off-the-Clock Work is Strictly Prohibited and that Its Policies Support that Position.*

Victra has a nationwide policy strictly prohibiting off-the-clock work (*see* Declaration of Kate Harrison in Support of Joint Motion for Preliminary Approval of Amended Settlement Agreement, attached as Exhibit 2 ("Decl.") ¶ 5) and has provided evidence that it has implemented a strict prohibition on failing to accurately record time, which could lead to corrective action up to and including termination. (Decl. ¶ 6.) Victra has also provided evidence that it expressly prohibits supervisors from requiring or even suggesting that any person work hours for which they were not clocked in, and, if a manager or supervisor ever asks, requires, or

---

[6] *See, e.g., Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1332-37 (11th Cir. 2014) (holding that arbitration agreements with collective action waivers are enforceable in the context of a FLSA putative collective action and thus affirming order compelling arbitration and dismissing FLSA complaint).

[7] *See, e.g., O'Brien v. Ed Donnelly Enterprises, Inc.*, 2006 WL 3483956, at *5 (S.D. Ohio Nov. 30, 2006) (determining collective action is not proper when individual defenses are needed, including whether plaintiffs worked the hours off-the clock), *aff'd*, 575 F.3d 567 (6th Cir. 2009).

implies that an employee work off-the-clock, such action is considered a gross and willful

violation and may result in immediate termination. (*Id.*) Though Plaintiffs dispute the efficacy

and enforcement of these measures, they acknowledge there will be hurdles in overcoming the

existence of such nationwide policies.

      b.    *Victra Asserts that Employees Are Responsible for the Accuracy of Their Time Records and Are Empowered to Make Any Required Modifications.*

Victra has provided evidence that, from at least 2016 forward, employees could review

their time records before they were finalized for payroll. (Decl. ¶ 12.) From 2016 to April 2019,

employees could, at any time, ask their supervisor or submit a request to HR to modify their time

cards. (Decl. ¶ 13.) As of April 2019, Victra asserts that employees can, at any time, view their

recorded time in Victra's timekeeping system while on Victra's system at the store, or on their

personal phones. (Decl. ¶ 14.) Victra has submitted evidence that employees can modify their

time themselves or can submit a request to HR to modify their time. (*Id.*)[8]

      c.    *Any Deviation from Victra's Otherwise Lawful Practices Would Be Due to a Rogue Supervisor.*

Victra's position is that Plaintiffs will only be able to show that any violations of law

would be due to *ad hoc* deviations from otherwise lawful practices by rogue supervisors, which

is insufficient to meet the standard for and otherwise sustain certification.[9] Plaintiffs maintain

---

[8] *See also, e.g., White v. Baptist Mem. Health Care Corp.*, 699 F.3d 869, 875 (6th Cir. 2012) (If an "employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work," then "the employer's failure to pay for the overtime hours is not a violation of" the FLSA.) (internal quotation omitted)); *Frye v. Baptist Mem. Hosp.*, 2010 WL 3862591, at *8 (W.D. Tenn. Sept. 27, 2010) (Mays, J.) ("Where employees sometimes use procedures to report time worked but neglect to do so for all time worked, an employer has no reason to know of the unreported time."), *aff'd* 495 F. App'x 669 (6th Cir. 2012).

[9] Some of the cases Victra has provided in support of this position include: *Salinas v. O'Reilly Auto., Inc.*, No. 3:04-CV-1861-B, 2005 WL 3783598, at *6 (N.D. Tex. Nov. 17, 2005) (finding plaintiff's evidence failed to convince court that alleged violations indicated company-wide

that the issues in this case arise from Victra's uniform plan, policies, and/or practices of willfully refusing to pay appropriate overtime compensation for all hours worked. Nonetheless, both Parties recognize the time, expense, and risk, inherent in litigating these issues and have taken such risks into consideration in negotiating the Total Maximum Settlement Amount.

> d.   *The Total Maximum Settlement Amount is Reasonable In Light Of the Theoretical Maximum Damages that Could Be Awarded at Trial.*

Altogether, the average recovery from the settlement will be $65.58, with a minimum recovery of $10.00, assuming an opt-in rate of 100%, which is unlikely, and a maximum recovery of $1,008.84. The table below shows how the average recovery differs among the Non-Manager Collective and the Store Manager Collective:

| Portion of Collective | Average Minimum Estimated Settlement Payment |
| --- | --- |
| Across entire Collective | $65.58 |
| Members of Both Store Manager Collective and Non-Manager Collective | $225.97 |
| Members of Store Manager Collective | $168.59 |
| Members of Non-Manager Collective | $15.48 |

---

policy or practice, even though many claims happened to involve failure to pay overtime for duties performed after closing hours, because claims were "flavored by particularized conduct occurring at the store/manager level" and should "be tried separately"); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005) (denying conditional certification where case would involve individual inquiries into instructions of different managers and different locations across the country); *Thompson v. Speedway SuperAmerica LLC*, No. 08-CV-1107(PJS/RLE), 2009 WL 130069, at *2 (D. Minn. Jan. 20, 2009) (denying conditional certification and noting that "plaintiffs must submit evidence that the reason why the employees were not compensated for these tasks is not because of human error or a rogue store manager, but because of a corporate decision to ignore [defendant's] published policies and refuse to pay for answering work-related phone calls or performing gas-price surveys.").

The difference in average recovery among the Non-Manager Collective and the Store Manager Collective is fair and reasonable. On average, putative members of the Store Manager Collective have much longer tenures as employees of Victra than putative members of the Non-Manager Collective, and work longer hours. For instance, over 66% of the putative members of the Store Manager Collective work over a year for Victra, and over 40% work more than two years for Victra. In sharp contrast, over 25% of members of the Non-Manager Collective work less than 3 months, and almost half of the members of the Non-Manager Collective work less than 6 months. Moreover, putative members of the Store Manager Collective on average work over 5 more hours a week than putative members of the Non-Manager Collective.[10] As described in further detail below, these amounts represent a fair and reasonable settlement of highly disputed claims, particularly in light of the arbitration agreements and the other hurdles to recovery discussed herein.

Plaintiffs have put forth two theories for unpaid overtime damages in this litigation. The first is based on the allegation that employees worked overtime hours off-the-clock for which they were not compensated. The second is based on the allegation that employees were underpaid overtime because commission payments and/or nondiscretionary bonuses were not properly included in the regular rate when overtime payments were calculated. Calculating potential damages under either theory presents a number of challenges, but the Parties have made a good faith effort to attempt to approximate potential damages and come to fair and reasonable settlement amounts based on those estimations.

---

[10] The above chart shows that Opt-In Plaintiffs who have worked as both Store Managers and Non-Managers would be paid the highest average estimated minimum settlement payments, in large part because they worked with Victra for long periods of time (during which they were promoted from Non-Store Manager to Store Manager).

With regard to alleged off-the-clock time, it is impracticable, if not impossible, for the Parties to estimate the maximum amount of damages from off-the-clock claims that could be awarded at trial, given the fact that off-the-clock hours are, by their very nature, not recorded. Still, Plaintiffs calculate the theoretical maximum damages that could be awarded at trial due to off-the-clock overtime hours, assuming a collective action, liquidated damages and that it could be established that Victra acted willfully, at about $2,000,000.  Plaintiffs concede that it is hotly disputed whether Plaintiffs could obtain liquidated damages or damages over a three-year period (instead of a two-year period), since Victra contends it acted at all times in good faith and any violation was not willful.

Moreover, due to Victra's policies prohibiting off-the-clock work and allowing employees to change their time records to reflect all time worked, as well as payroll records showing that Potential Opt-In Plaintiffs indeed correctly recorded any overtime,[11] Plaintiffs acknowledge there is a significant risk that they will be unable to establish damages for off-the-clock work.

Despite these hurdles to recovery, the Total Maximum Settlement Amount contemplates the possibility that Plaintiffs and putative members of the Collective performed some off-the-clock work and provides compensation for it.  This possibility is addressed by the minimum Base Payment to Opt-In Plaintiffs of $10-25, along with the pro rata distribution of a portion of the

---

[11] Indeed, the records available (and relied on by the Parties during their negotiations) demonstrate that Victra employees routinely report all hours worked, including overtime hours. For instance, Non-Managers report (and, in turn, are paid) some overtime in approximately 23% of their weeks, and Store Managers report (and, in turn, are paid) some overtime in approximately 50% of their weeks.  Across the time period relevant to this matter, the average overtime per week is approximately 1.1 hours for Non-Managers, and approximately 3.2 hours for Managers.  This again demonstrates that when employees work overtime, they report it and are paid for it.  All of this weighs heavily against any allegation, for example, that employees are instructed by superiors not to record overtime.

Total Maximum Settlement Amount.  The Total Maximum Settlement Amount estimates approximately $900,000 for payment of off-the-clock claims, which reflects a recovery of about 45% of the total maximum damages Plaintiffs believe they could achieve at trial.

Next, assuming an opt-in rate of 100%, Plaintiffs estimate the theoretical maximum damages, including liquidated damages, that could be awarded at trial due to alleged miscalculation of the regular rate at about $1,200,000.[12]  Victra believes that Plaintiffs are very unlikely to receive a damages award of this magnitude, given that Victra contends its method of incorporating commission payments into the regular rate is lawful, and further contends that a per-workweek calculation is not possible and not practicable, and thus not required under the FLSA because, *inter alia*, data reflecting commissions earned on a per-workweek basis is impracticable to obtain for each Plaintiff and Potential Opt-In Plaintiff, and that such calculations are not practicable for Victra to perform.  *See* 29 C.F.R. § 778.120.  Moreover, Victra contends that 975 of the 21,356 Potential Opt-In Plaintiffs (approximately 4.5% of the Opt-In Plaintiffs) worked less than three weeks for Victra, and therefore likely never even completed the training required to earn commissions.  For these Potential Opt-In Plaintiffs, the Parties agree they would be unlikely to be eligible to obtain any "overtime rate" damages at trial.  In addition, as stated, the Parties agree that it is disputed whether Plaintiffs could obtain liquidated damages or damages over a three-year period (instead of a two-year period), since Victra contends it acted in all times in good faith and any violation was not willful.

Despite these hurdles to recovery, the Total Maximum Settlement Amount contemplates the possibility that, because of overtime rate calculations not including commissions, the

---

[12] Despite knowing the amount of overtime worked per week by each Potential Opt-In Plaintiff, it is not possible to calculate the specific amount of damages based upon the amount of commissions earned each week because, as stated, Victra contends that such records is impracticable to obtain for each Plaintiff and Potential Opt-In Plaintiff.

Potential Opt-In Plaintiffs were not compensated correctly for their overtime work. The Total Maximum Settlement Amount estimates approximately $500,000 for payment of these claims, which reflects a recovery of about 42% of the total maximum damages Plaintiffs believe they could achieve at trial.

              e.      *The Calculation of Individual Settlement Payments under the Amended Settlement Agreement Has Been Revised to Provide Further Compensation to Opt-In Plaintiffs.*

In revising the settlement and seeking to follow the guidance from this Court's Order, the Parties carefully reevaluated the calculation of Potential Opt-In Plaintiffs' Individual Settlement Payments to analyze the distribution across the Collective. In this process, the Parties determined that the allocation formula could be construed as overcompensating some and undercompensating others because it provided the same amount of compensation to Potential Opt-In Plaintiffs so long as the employee worked at least five days in a week, regardless of whether the employee worked a five-day, six-day, or seven-day workweek. To eliminate these issues, the Parties decided that Potential Opt-In Plaintiffs' should receive compensation even if they worked only four days in a week (since it was possible, although remote, that such employee could have potentially worked overtime in such period of time), and should receive more compensation depending if they worked four, five, six, or seven days in a week (as the possibility of an employee working overtime increases the more days per week they work).[13]

---

[13] The following are two examples of how the Individual Settlement Payments would be calculated:

Example 1. In this example, a hypothetical Opt-In Plaintiff is a member of both the Store Manager Collective and the Non-Manager Collective. If this Opt-In Plaintiff worked a total of 26 weeks as a Non-Manager, working 4 days each week, that corresponds to 26 points. If this Opt-In Plaintiff then became a Store Manager and worked a total of 26 weeks, working 5 days a week, that corresponds to 52 points. Given that there are 1,260,296 total potential points in the Non-Manager Collective and 479,040 total potential points in the Manager Collective, this individual's Pro Rata Share would be 0.0021% for the time as a Non-Manager ($8.82 payment from the Non-Manager Maximum Settlement Amount) and 0.0109% for the time as a  Store

(*See* Paragraph 7.2.)  The Parties agree that this metric better correlates to the likelihood that an employee would have worked overtime hours that, under Plaintiffs' allegations and theories of recovery, were undercompensated either due to an alleged miscalculation or off-the-clock work.

The Parties, recognizing the time and effort required of each Opt-In Plaintiff to opt in, as well as the fact that compensation for alleged off-the-clock work is impracticable to estimate, have agreed to provide all Opt-In Plaintiffs with a Base Payment.  Despite the fact that Victra strongly contends that estimated trial damages due to off-the-clock work would be non-existent (or, at best, *de minimis*) given Victra's policies and the ability of employees to edit their timesheets, Victra has agreed to increase the amount of money offered in the settlement, so that every Opt-In Plaintiff could receive a Base Payment of at least $10, based on an opt-in rate of 100%, and as much as $25.  The table on the following page shows how the amount of the Base Payment will increase up to $25, depending on the number of Opt-In Plaintiffs who join the Collective:

---

Manager ($82.43 payment from the Manager Maximum Settlement Amount).  Assuming a 30% opt-in rate distributed evenly across the entire Collective (6,407 Opt-In Plaintiffs), the Base Payment for this Opt-In Plaintiff would be the maximum $25 amount.  Because this calculation leaves an unallocated remainder of the Base Settlement Amount, this Opt-In Plaintiff's Individual Settlement Payment would be increased by a Pro Rata Share of the unallocated remainder of the Base Settlement Amount (divided in two parts for Store Managers and Non-Managers), which is $4.10.  Plaintiff's Individual Settlement Payment would be $25.00 + $4.10 + $8.82 + $82.43, which equals a total payment of $120.35.  For the purposes of this example, we assumed that there were no Unapproved Fee Amount as set forth in Paragraph 7.5.

Example 2.  In this example, a hypothetical Opt-In Plaintiff is a member of the Non-Manager Collective and never worked more than 3 days in a workweek.  As a result, this person would have 0 points, and would only receive the base payment.  If 100% of Potential Opt-In Plaintiffs opt in, then this person would receive a $10 Base Payment.  If 40% of Potential Opt-In Plaintiffs opt in, then this person would receive a $25 Base Payment.

| Opt In Rate | Base Payment per Opt-In Plaintiff |
|---|---|
| 100.00% | $10.00 |
| 80.00% | $12.50 |
| 66.67% | $15.00 |
| 57.15% | $17.50 |
| 50.00% | $20.00 |
| 44.45% | $22.50 |
| 40.00% | $25.00 |

Additionally, should there be any portion of the Base Settlement Amount remaining after a maximum Base Payment of $25 per Opt-In Plaintiff, the remaining portion shall be divided in two parts, for the Store Manager Collective and the Non-Manager Collective, and such amounts shall be distributed to Opt-In Plaintiffs in accordance with their Pro Rata Share of the Manager Maximum Settlement Amount or the Non-Manager Maximum Settlement Amount. (*See* Paragraph 7.2.)

> f.    *In Light Of the Reasonableness of the Total Maximum Settlement Amount and the Individual Settlement Payments, the Reversionary Provisions of the Amended Settlement Agreement Are Reasonable.*

Finally, the Order expressed potential concern regarding the reversionary provisions governing unclaimed settlement funds. On these points, the Parties respectfully submit that the calculation of the Individual Settlement Payments as set forth in Paragraphs 7.1 through 7.5 is reasonable, and that all approximately $1.4 million should not be guaranteed to be paid to the Collective regardless of how many individuals opt in. This is a fair and reasonable procedure in this collective action where, unlike an opt-out class action, Potential Opt-In Plaintiffs who do not specifically choose to opt in to the settlement will retain their claims and not be subject to any form of a release. There is tremendous uncertainty about the number of Potential Opt-In Plaintiffs who may choose to join the Collective, and it would not be fair or reasonable for a few number of Opt-In Plaintiffs to split a large settlement amount negotiated and designed to

compensate over 20,000 individuals. Indeed, counsel for Potential Opt-In Plaintiffs represented

in related lawsuits has indicated that many Potential Opt-In Plaintiffs will not join the Collective,

*see, e.g.*, Memorandum of Law in Support of James Baggott's Motion to Intervene, ECF 40 at

11, and, as a result, the Claimed Settlement Amount set forth in Paragraph 5.3 is calculated based

on the actual number of opt-ins to maintain proportionality between the number of Opt-In

Plaintiffs and the Individual Settlement Payments for those collective action members.[14]

Moreover, the Parties agree that the Amended Settlement Agreement represents a negotiated

compromise to resolve this dispute, without either party having conceded their position on the

merits, nor has there been any finding of wrongdoing by any Party.

Nevertheless, where possible, the Parties have agreed that if certain monies remain

unclaimed or unpaid, that money will be distributed in such a way that it benefits the Opt-In

Plaintiffs, Victra's employees, or both. For instance, the Parties have agreed that, for any

settlement checks not cashed within 90 days of the issuance date, the money allocated for that

check shall be subject to *cy pres* donation to a nonprofit charitable organization that benefits

Victra employees. (Paragraph 10.2.) In addition, any Unapproved Fee Amount and any

unclaimed Base Payment Amount will be distributed to each Opt-In Plaintiff on a pro-rata basis.

3.    The Released Claims in the Amended Settlement Agreement Share a Factual Predicate with the Claims Pled in the Complaint.

To address the Order's potential concern regarding the scope of the release that Opt-In

Plaintiffs would agree to, the Parties have negotiated for the Released Claims to be limited to:

"any and all known and unknown claims arising under the FLSA that accrued during the

---

[14] FLSA settlements allowing for reversion of unclaimed settlement amounts to revert back to defendants are routinely approved by courts across the country. *See, e.g.*, *Warren v. Cook Sales, Inc.*, No. CV 15-0603-WS-M, 2017 WL 325829, at *4, *8 n.11 (S.D. Ala. Jan. 23, 2017); *Pliego v. Los Arcos Mexican Restaurants, Inc.*, 313 F.R.D. 117, 122 (D. Colo. 2016).

Applicable Class Period arising under the FLSA and relating to the payment or non-payment of (1) overtime wages, including the calculation of overtime wages, or (2) compensation for off-the-clock work as asserted in the Second Amended Complaint." (Paragraph 8.2.) This provision limits the Released Claims to those two categories of allegations brought by Plaintiffs: (1) that Victra allegedly underpaid overtime wages and (2) that Victra allegedly failed to compensate Plaintiffs for off-the-clock work. As a result, the release is circumscribed to those claims pled by Plaintiffs. (*See* Order at 38.) Furthermore, in order to opt in to the Settlement, each Opt-In Plaintiff will attest in the Consent Form that he or she believes "at some point during the time period of June 10, 2016 through August 7, 2020 and in the course of my employment for VICTRA, (1) there were one or more workweeks when [he/she] worked overtime and earned commission payments and/or nondiscretionary bonuses; AND/OR (2) [he/she] worked overtime hours off-the-clock for which [he/she] believe[s] [he/she] was not fully compensated." This attestation should help to ensure a reasonable and factual connection between the claims in this matter and the Opt-In Plaintiffs whose claims get released.

The Amended Settlement Agreement also specifies, in Paragraph 8.1, that the broader General Release attached to the agreement is solely applicable to the Named Plaintiffs and "does not bind any of the Opt-In Plaintiffs." This broader release was negotiated in exchange for the additional monetary consideration provided to the Named Plaintiffs in the Service Awards.

4.    The Amended Settlement Agreement is the Product of Arms-Length Negotiation Between Sophisticated Counsel.

There is no evidence of, nor was there any fraud or collusion that occurred between counsel. *See Schneider v. Goodyear Tire & Rubber Co.*, No. 13-2741, 2014 WL 2579637, at *2 (N.D. Ohio June 9, 2015) (considering the risk of fraud or collusion between the parties in determining whether to approve an FLSA settlement and concluding that because the parties had

engaged in court-supervised negotiations, there was no such risk). This settlement was reached as a result of arms-lengths negotiations and a mediation conducted by Michael Russell between the Parties through experienced wage and hour attorneys.

During the litigation and settlement of this action, Plaintiffs were represented by counsel both respected in the community and experienced in handling wage and hour collective actions. Plaintiffs' counsel have the experience to assess the risks of continued litigation and benefits of settlement and have done so in this action. Plaintiffs' counsel represents employees with claims against employers similar to the claims asserted in this case. Defense counsel is likewise experienced in defending similar claims. Counsel for both Parties have advised their respective clients regarding the settlement, and they have recommended judicial approval. Those recommendations, the Parties respectfully submit, should be afforded some weight. *See Lynn's Food Stores*, 679 F.2d at 1354 (recognizing that courts rely on the adversary nature of a litigated FLSA case resulting in settlement as an indication of fairness).

The complexity, expense, and likely duration of the litigation should a settlement not have been reached weighs heavily in favor of finding that this settlement is fair and reasonable. Without question, if the case does not settle, the Parties will have to spend significant time and resources, whether in litigation or arbitration, completing written and deposition individual discovery, including deposing various Plaintiffs, putative members of the collective and Defendant's upper management witnesses. After the resolution of these issues, the Parties would have faced the prospect of expensive, lengthy individual arbitrations. Rather than take this path, the Parties directed their efforts toward an early, informed, efficient resolution of Plaintiffs' claims. Preparation for the Parties' mediation session enabled counsel to assess the respective strengths and weaknesses of their case and reach the conclusion that settlement is in the Parties'

best interest.  The settlement eliminates the inherent risks both sides would bear if this case were to continue.  Under these circumstances, the settlement is fair, reasonable, and adequate for Plaintiffs, and the Court should approve it.

> 5.    <u>The Attorneys' Fees Contemplated in the Amended Settlement Agreement Are Reasonable Given the Work Performed by Plaintiffs' counsel.</u> [15]

As indicated by the cases cited in the Court's Order, courts within this Circuit will typically approve fees in the range of 25% to 35% of the total award for FLSA collective actions. *See* Order at 42 (citing *Rembert v. A Plus Home Health Care Agency LLC*, 2020 WL 1443041, at *3 (S.D. Ohio Mar. 25, 2020); *Does 1-2 v. Déjà Vu Servs., Inc.*, 925 F.3d 886 (6th Cir. 2019)); *see also, Robbins et al. v. Flowers Foods, Inc.* No 1:19-cv-01021-STA-egb [D.E. 23] (W.D. Tenn. Feb. 27, 2019) (approving reversionary settlement fund of possible $9,000,000 total settlement amount and awarding $3,600,000 (40% of total settlement) to plaintiffs' counsel in attorneys' fees and costs); *Williams v. Bevill*, No. 4:14-CV-82-TRM-SKL, 2016 WL 773230, at *2 (E.D. Tenn. Feb. 8, 2016), <u>report and recommendation adopted,</u> No. 4:14-CV-82, 2016 WL 792417 (E.D. Tenn. Feb. 29, 2016); *Macklin v. Delta Metals Co., Inc.*, No. 2:08-CV-02667, 2011 WL 13070420 (W.D. Tenn. July 6, 2011) (McCalla, J.) (Order awarding $48,802.02 in attorneys' fees and costs and $300.15 in damages); *McLain et. al. v. First Acceptance Corp.*, No. 3-17-cv-00408 [D.E. 57] (M.D. Tenn. 2018) (Crenshaw J./Holmes M.J.) (Order approving attorneys' fees and costs approximating 66% of the total settlement amount); *Wilson et. al. v. MMR Senior Alliance Corp et. al.*, No. 3:17-cv-1412 [D.E. 56] (M.D. Tenn. 2018) (Crenshaw J./Holmes M.J.) (Order approving attorneys' fees and costs approximating 50% of the total settlement amount).  Here, Plaintiffs' counsel will seek approval from the Court for its

---

[15] To address the Court's concerns raised in the Order, the Amended Settlement Agreement no longer contains a "clear sailing clause" or a "kicker clause" in the section governing Attorneys' Fees and Expenses.  (*See generally*, Paragraph 7.5.)

Attorneys' Fees and Expenses in an amount not to exceed $442,250.00, which amount constitutes less than 25% of the all funds included in the Amended Settlement Agreement, and thus falls below that typical range.

The Parties recognize that, as the Court stressed in its Order, such fees are not automatically reasonable without more evidence demonstrating the work performed by Plaintiffs' counsel.    To date, Plaintiffs' counsel has expended hundreds of hours of attorney time in this matter including drafting the Complaint and Amended Complaint, investigation and analysis of claims, travel time, meetings with the Named Plaintiffs, correspondence and interviews with clients, correspondence with opposing counsel (both for Defendant and Putative Intervenors), informal discovery and complex analysis of hundreds of thousands of pay records/data to come to a fair and reasonable settlement for Plaintiffs and the Putative Class. The Parties also conducted a full-day mediation session to come to an agreed resolution of this matter.    Along with this mediation, Plaintiffs assisted with the drafting of the proposed Settlement Agreement and Motion to approve.    Additionally, Plaintiffs' counsel began the research for a Motion for Conditional Class Certification prior to an agreement being reached to resolve this matter.    Finally, Plaintiffs have responded to three motions to intervene filed by putative intervenors.    One further indication that the Attorneys' Fees and Expenses are reasonable is that Plaintiffs' counsel has not sought any additional fees despite negotiating for an additional $337,826.40 for the Collective to allow for a minimum base payment for all Potential Opt-In Plaintiffs and cover an extension of the covered period through August 7, 2020. Moreover, after the opt-in process is complete, the Court will have the opportunity to reevaluate the reasonableness of Plaintiffs' fees before granting final approval of the Amended Settlement Agreement.    During that process, should the Court approve an amount of attorneys' fees lower

than the negotiated maximum figure ($442,450.00), a portion of any Unapproved Fee Amount

will be distributed to each Opt-In Plaintiff as set forth in Paragraph 7.5.

<u>**CONCLUSION**</u>

This FLSA collective action settlement is a product of an arms-length negotiation

between counsel and it resolves a *bona fide* dispute over Plaintiffs' FLSA claims.  The settlement

is fair and reasonable.  It provides Plaintiffs with significant monetary relief, and it likewise

makes a significant amount of relief available to the putative members of the collective.

Accordingly, the Parties jointly and respectfully request that this Court grant preliminary

approval of the Parties' Amended Settlement Agreement so that notice can be sent to the

Potential Opt-In Plaintiffs as set forth in the Amended Settlement Agreement.  Furthermore, the

Parties jointly request that the Court preliminarily approve as reasonable the service awards to

the Plaintiffs in the amount stated in the Amended Settlement Agreement.


Date: August 14, 2020                           Respectfully submitted,

                                                *s/ J. Russ Bryant*
                                                J. Russ Bryant (TN Bar No. 033830)
                                                Gordon E. Jackson (TN Bar No. 08323)
                                                Robert E. Turner, IV (TN Bar No. 35364)
                                                **JACKSON, SHIELDS, YEISER, HOLT,**
                                                **OWEN & BRYANT**
                                                262 German Oak Drive
                                                Memphis, TN 38018
                                                Telephone: (901) 754-8001
                                                Facsimile: (901) 754-8524
                                                *gjackson@jsyc.com*
                                                *jholt@jsyc.com*
                                                *rbryant@jsyc.com*
                                                *pjackson@jsyc.com*
                                                *rturner@jsyc.com*

                                                ATTORNEYS FOR PLAINTIFFS

                                                            &

/s/ *Angela C. Zambrano*_____
Angela C. Zambrano, Esq., *pro hac vice*
**SIDLEY AUSTIN LLP**
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Facsimile: 214.981.3400
Margaret Hope Allen, Esq., *pro hac vice*
Natali Wyson, Esq., *pro hac vice*

Jenna M. Bedsole
Zachary B. Busey
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ**
First Tennessee Building, Suite 2000
165 Madison Avenue
Memphis, Tennessee 38103

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system this the 14th day of August 2020.

*s/ Angela C. Zambrano*