**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JACOB O'BRYANT et al.,** | ) | |
| | ) | **Civil No. 2:19-cv-02378-SHM-tmp** |
| **Plaintiffs,** | ) | |
| | ) | **JURY DEMAND** |
| **v.** | ) | |
| | ) | |
| **ABC PHONES OF NORTH CAROLINA,** | ) | |
| **INC., d/b/a VICTRA, f/d/b/a A Wireless,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**JOINT MOTION AND INCORPORATED MEMORANDUM FOR**
**FINAL APPROVAL OF AMENDED SETTLEMENT AGREEMENT**

The Court preliminarily approved the Amended Settlement and Release Agreement (the "Amended Settlement Agreement") (ECF No. 71-1) on December 22, 2020 (ECF No. 94) (the "Preliminary Approval Order").[1]  Plaintiffs Jacob O'Bryant and Mark Brandon Baker ("Plaintiffs") and Defendant ABC Phones of North Carolina, Inc. d/b/a Victra ("Victra" and together with Plaintiffs, the "Parties") now file this Joint Motion and Incorporated Memorandum for Final Approval of the Amended Settlement Agreement (the "Joint Motion").[2]

---

[1]  Any capitalized terms not defined herein have the meanings given to them in the Amended Settlement Agreement.

[2]  The Declaration of Jennifer Mills ("Mills Decl."), Declaration of Bryan Niederberger ("Niederberger Decl."), and Agreed Order of Dismissal are attached to this Joint Motion as Exhibits 1 through 3, respectively.

## I.    BACKGROUND

### A.    Procedural History Leading to the Amended Settlement Agreement

#### 1.    *Plaintiffs' Lawsuit*

On June 10, 2019, the Named Plaintiffs, individually and on behalf of all other "similarly-situated" individuals, filed a collective action lawsuit against Victra. (ECF No. 1.)  On September 9, 2019, Plaintiffs filed their First Amended Complaint.  (ECF No. 12.)  On August 11, 2020, Plaintiffs filed their Second Amended Complaint, which is the operative complaint.  (ECF No. 67.)  The Second Amended Complaint identifies two groups of allegedly-similarly-situated individuals: (1) all current and former retail managers of Victra who were paid an hourly wage plus commission and who were employed in the United States during the statutory period, and (2) all current and former retail employees of Victra who were paid an hourly wage plus commission and who were employed in the United States during the statutory period.  (ECF No. 67 ¶¶ 4–5.)

#### 2.    *Victra Produced Substantial Data, Which Plaintiffs' Counsel Extensively Analyzed*

After the Original Complaint was filed, the Parties agreed to attempt to mediate this dispute on August 21, 2019.  In preparation for the mediation, the Parties conducted informal discovery and investigation of the facts and law.  Specifically, Victra produced, for settlement purposes only and as a show of an intent to negotiate in good faith, over 400,000 payroll records containing 24 variables related to the Named Plaintiffs and putative members of the collective.  These payroll records contained hours and wage information spanning more than three years of pay periods, including regular hours and pay, overtime hours and pay, commissions and special incentive payments, extra unearned overtime payments, and other payroll components.  Personally identifying information was removed from the data, and a randomly assigned employee ID was provided as a proxy to allow Plaintiffs' Counsel to analyze the records and attempt to estimate any

potential damages for Plaintiffs' claims on a per employee basis.  Relying on their investigations

and analysis of applicable law, the Parties engaged in arm's length settlement negotiations.

### 3.    Mediation

On August 21, 2019 the Parties participated in mediation with a neutral, third-party

mediator, Michael Russell,[3] and were successful in reaching a tentative resolution as to Victra's

Store Managers.[4]  At the mediation, Victra disputed the merits of Plaintiffs' claims and emphasized

its belief that the enforceable arbitration agreements between the Parties precluded Plaintiffs from

pursuing their claims on a class or collective basis.  Plaintiffs maintained their position that the

claims had merit and would be pursued through litigation or arbitration if a settlement were not

reached.  As noted above, to avoid the time, costs, and resources of resolving this dispute through

litigation or arbitration, the Parties reached a tentative agreement to settle the claims of the Store

Managers.  After the mediation, the Parties also reached a resolution as to Victra's Non-Managers.

### 4.    The Court's Initial Settlement Order and the Parties' Amended Settlement Agreement

Following the mediation, the Parties worked together to negotiate the additional terms of

their settlement agreement, such as the administration of the individual settlement payments, the

language to be included in the notice to Potential Opt-In Plaintiffs, the service awards for Named

Plaintiffs, and the maximum amount of attorneys' fees, costs, and expenses to be paid to Plaintiffs'

---

[3]  Mr. Russell is widely regarded as the best employment law mediator in Tennessee.  He is a
Nashville-based mediator and arbitrator.  He is a member of the National Academy of
Distinguished Neutrals.  Mr. Russell has been listed in Best Lawyers in America, Mid-South Super
Lawyers, Top 100 Lawyers in Tennessee, and Top 50 Lawyers in Nashville.  He is rated "AV
Preeminent" by Martindale Hubbell and is a two-time recipient of Best Lawyers' "Nashville
Lawyer of the Year" Award.

[4]  Through informal discovery conducted prior to the mediation Plaintiffs learned that an
enforceable arbitration agreement including a class waiver exists between Victra and the Named
Plaintiffs and the putative members of the collective (the "Arbitration Agreement").

counsel by Victra upon approval by the Court.  After such negotiations, the Parties agreed upon the Settlement and Release Agreement filed September 9, 2019 (the "Initial Settlement Agreement") in conjunction with the Joint Motion for Settlement Approval.  (ECF No. 14.)

During the pendency of the Joint Motion for Settlement Approval, the Parties negotiated the First Amendment to Settlement, filed July 3, 2020, in conjunction with a Joint Motion for Approval.  (ECF No. 58.)  The revised settlement provided further benefits to the Plaintiffs in the amount of $190,888, extended the Applicable Class Period to May 30, 2020, and made clear that, consistent with California law, the settlement did not intend to release any claims under the Private Attorneys General Act, as provided in Cal. Labor Code § 2699, *et seq*.

On August 4, 2020, the Court issued an Order denying the Joint Motion for Settlement Approval and Joint Motion for Approval of First Amendment to Settlement and Release Agreement (the "Initial Settlement Order").  To address the issues raised in the Initial Settlement Order, the Parties then negotiated changes to the structure of their settlement and the terms of the Initial Settlement Agreement, which were memorialized in the Amended Settlement Agreement and explained in the Parties' Joint Motion for Preliminary Approval of Amended Settlement (ECF No. 71) (the "Preliminary Approval Motion").  The Parties also filed a Stipulated Motion and Incorporated Memorandum for Conditional Certification of the Collective Encompassed by the Parties' Settlement (ECF No. 68) (the "Conditional Certification Stipulated Motion"), in which they stipulated to and requested conditional certification of the defined collective.

As the Parties outlined in the Preliminary Approval Motion, the Parties incorporated several modifications in the Amended Settlement Agreement to address the points raised in the Initial Settlement Order.  (ECF No. 71 at 5–6.)  Although not addressed in the Court's Initial Settlement Order, the Parties negotiated further benefits to the Potential Opt-In Plaintiffs.  In the

wake of the Initial Settlement Order, the Parties closely scrutinized the distribution of available payments among the Potential Opt-In Plaintiffs and determined that certain other changes in the calculation and structure of payments under the settlement would result in increased benefits to the collective, as detailed in the Preliminary Approval Motion.  (ECF No. 71 at 6–7.)

### B.    The Conditional Certification Order and Preliminary Approval Order

On October 15, 2020, the Court issued an Order Accepting and Granting the Conditional Certification Stipulated Motion (ECF No. 87) (the "Conditional Certification Order").  Thus, in accordance with the Parties' stipulations, the Court conditionally certified the following collective:

> Current and former non-exempt employees of Defendant VICTRA who worked as store managers and non-manager retail employees who worked in any Defendant VICTRA-owned store in the United States at any time between June 10, 2016, and August 7, 2020.

On December 22, 2020, the Court entered the Preliminary Approval Order.  (ECF No. 94.) In relevant part, the Court conditionally approved the Amended Settlement Agreement as fair, reasonable, and adequate and found that the Notices fully satisfy the requirements of due process and provide the best notice practicable under the circumstances to all Potential Opt-In Plaintiffs who can be identified through reasonable effort.  (*Id.* at 44.)  The Court directed the Parties to send the Notice, as outlined in the Amended Settlement Agreement, with this change made by the Court: "In the last sentence of the section titled 'What do I give up by participating in this settlement?,' the phrase 'amount of the enclosed check' shall be updated to read 'estimated payment amount reflected in this notice.'"  (*Id.* at 32, 44.)

Additionally, the Court ordered Victra to provide the Settlement Administrator with a chart listing the names, employee identification numbers, last known addresses, email addresses, Social Security numbers, and any other pertinent information necessary to the administration process as that information exists in the business records of Victra of the Potential Opt-In Plaintiffs.  (*Id.* at

45.)  The Court also ordered the Parties to provide the Settlement Administrator calculations, consistent with the calculation formula set forth in the Amended Settlement Agreement, showing the approximate amount for each Potential Opt-In Plaintiff's Individual Settlement Payment.  (*Id.*)

Lastly, the Court ordered the Notices to be distributed by mail within 14 days after the receipt of the chart with the Potential Opt-In Plaintiffs' information and set a 90-day Opt-In Deadline.  (*Id.* at 46.)  The Court ordered that, within 60 days of the Opt-In Deadline, all Consent Forms shall be filed with the Court, upon which each Potential Opt-In Plaintiff who submitted a Consent Form will become an Opt-In Plaintiff and member of the Collective under the terms of the Amended Settlement Agreement, and thus subject to all terms applicable to Plaintiffs.  (*Id.*)

### C.    The Notices Were Distributed and Approximate Individual Settlement Payments Were Calculated in the Form and Manner Approved by the Court

Rust Consulting is the Settlement Administrator.  (Ex. 1, Mills Decl. ¶¶ 1–4.)  Consistent with the Court's Preliminary Approval Order and the Parties' Amended Settlement Agreement, Victra provided the Settlement Administrator with a chart list containing the Potential Opt-In Plaintiffs' names, last known addresses, Social Security Numbers, and applicable employment information (*id.* ¶ 9), along with calculations showing the approximate Individual Settlement Payments for each of the Potential Opt-In Plaintiffs.  (Ex. 2, Niederberger Decl. ¶ 3; *see* Agreement ¶ 7.1.)  To calculate the approximate Individual Settlement Payments, payroll and detailed punch data for pay periods from June 10, 2016 to August 7, 2020 (the "Payroll and Punch Data") was applied to the allocation formula defined and explained in the Amended Settlement Agreement (the "Allocation Formula").  (Ex. 2, Niederberger Decl. ¶ 4; *see* Agreement ¶ 7.2.)

Under the Allocation Formula, each Potential Opt-In Plaintiff initially was allocated a minimum Base Payment of $10.00 out of the Base Settlement Amount of $213,560.00.  (Ex. 2, Niederberger Decl. ¶ 4; *see* Agreement ¶¶ 3.2, 7.2(a).)  In addition to the Base Payment, each

6

Potential Opt-In Plaintiff was assigned one (1) point for each day worked in a calendar week in excess of three (3) days as a Store Manager or Non-Manager from June 10, 2016 to August 7, 2020.  (Ex. 2, Niederberger Decl. ¶ 4; *see* Agreement ¶ 7.2(b)–(c).)  All points for Potential Opt-In Plaintiffs in each Store Manager Collective and Non-Store Manager Collective were added together to obtain the Total Denominator for each sub-fund.  (Ex. 2, Niederberger Decl. ¶ 4; *see* Agreement ¶ 7.2(d).)  The total number of points for each Potential Opt-In Plaintiff was individually divided by the Total Denominator for either the Store Manager Collective or the Non-Manager Collective to obtain each Potential Opt-In Plaintiff's Pro-Rata Share.  (Ex. 2, Niederberger Decl. ¶ 4; *see* Agreement ¶ 7.2(e).)  Each Potential Opt-In Plaintiff's Pro Rata Share was multiplied by the Manager Maximum Settlement Amount of $759,328.32 or the Non-Manager Maximum Settlement Amount of $427,688.08, whichever is applicable.  (Ex. 2, Niederberger Decl. ¶ 4; *see* Agreement ¶¶ 3.2, 7.2(f).)  The resulting amount was added to each Potential Opt-In Plaintiff's Base Payment to be the Individual Settlement Payment.  (Ex. 2, Niederberger Decl. ¶ 4; *see* Agreement ¶ 7.2(f).)

The Settlement Administrator processed and updated the mailing addresses for each Potential Opt-In Plaintiff by using the National Change of Address Database.  (Ex. 1, Mills Decl. ¶ 10.)  The Settlement Administrator also obtained a mailing address for receiving Consent Forms, written exclusion requests, undeliverable Notices, and other communications relating to the settlement; a toll-free telephone number for Potential Opt-In Plaintiffs to call with questions about the settlement; and a website address of www.OBryantBakerSettlement.com.  (*Id.* ¶¶ 5–7.)  The website included the Notice, Consent Form, and Amended Settlement Agreement for viewing, downloading, or printing; the option to submit a Consent Form electronically; and additional information about the settlement.  (*Id.* ¶ 7.)

On December 28, 2020, the Settlement Administrator received copies of the Court-approved Notice and Consent Form from counsel for Victra.  (*Id.* ¶ 8.)  The Settlement Administrator then completed the Notice by, for example, adding dates for the Opt-In Deadline of April 19, 2021, and the Final Approval Hearing of July 1, 2021.  (*Id.*)  Counsel for Victra approved the final Notice that the Settlement Administrator prepared.  (*Id.*)  On January 19, 2021, the Settlement Administrator mailed the Notices, including the Consent Forms, to each of the 21,354 Potential Opt-In Plaintiffs.  (*Id.* ¶ 11.)  The Notice advised the Potential Opt-In Plaintiffs that they could submit a Consent Form postmarked by April 19, 2021.  (*Id.*)  Additionally, two self-identifying Potential Opt-In Plaintiffs contacted the Settlement Administrator to request inclusion in the settlement (the "Self-IDs").  (*Id.* ¶ 12.)  Victra determined that the Self-IDs should receive Notice, and the Settlement Administrator sent Notice to the Self-IDs.  (*Id.*)

The Settlement Administrator also sent periodic reminder emails to Potential Opt-In Plaintiffs for whom email addresses were located by Victra.  (*Id.* ¶ 13.)  A draft of the reminder email content was prepared by the Settlement Administrator and then revised and approved by the Parties before it was sent.  (*Id.*)  On February 24, 2021, emails were sent to 12,740 Potential Opt-In Plaintiffs who had not submitted a Consent Form or requested exclusion as of that date.  (*Id.*)  The emails served as a reminder of the Opt-In Deadline for submission of Consent Forms, and the emails also provided the Settlement Administrator's toll-free telephone number for the settlement.  (*Id.*)  Three subsequent reminder emails were sent on March 15, April 1, and April 14, 2021.  (*Id.*)

A total of 464 Notices were returned to the Settlement Administrator with a forwarding address, and 2,982 Notices were returned as undeliverable without a forwarding address.  (*Id.* ¶¶ 14–15.)  The Settlement Administrator promptly re-mailed the Notices to the provided forwarding addresses.  (*Id.* ¶ 15.)  For the remaining 2,982 Notices, the Settlement Administrator performed

address traces for each of the Potential Opt-In Plaintiffs and located 2,594 more current addresses. (*Id.* ¶ 14.) Of the 2,594 re-mailed Notices, 444 were returned as undeliverable a second time. (*Id.*) Despite utilizing the National Change of Address Database and performing address traces, the Settlement Administrator was unable to mail the Notices to 832 Potential Opt-In Plaintiffs, which is less than 4% of the Potential Opt-In Plaintiffs.[5] (*See id.*)

The Settlement Administrator has received 3,804[6] valid Consent Forms. (*Id.* ¶ 16.) The Settlement Administrator received 3,750 valid Consent Forms that were submitted with a postmark on or before the Opt-In Deadline. (*Id.*) The Settlement Administrator received 11 Consent Forms with incomplete information, so it sent the respective Potential Opt-In Plaintiffs letters asking them to supply the missing information (the "Cure Letters"). (*Id.*) After sending the Cure Letters, the Settlement Administrator received nine complete Consent Forms; two Consent Forms remain incomplete because the Settlement Administrator did not receive returned Cure Letters. (*Id.*) Thus, the two incomplete Consent Forms are not considered valid Consent Forms. (*Id.*) The Settlement Administrator also received 54 Consent Forms that were submitted with a postmark after the Opt-In Deadline and with complete information. (*Id.*) Counsel for the Parties agreed to accept these late Consent Forms, so all 54 Consent Forms are considered valid Consent Forms.

---

[5] Even in the class action context, there is no requirement that actual written notice be provided to every class member. *See, e.g.*, *In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 1:15-MD-2627AJT-TRJ, 2019 WL 10749716, at *3 (E.D. Va. Aug. 23, 2019) (finding notification program that provided actual notice to 73% of class members constituted best notice practicable under circumstances).

[6] Moments before the Parties filed this Joint Motion, the Settlement Administrator informed the Parties that an additional late Consent Form was submitted for Employee ID 31178, in an amount of $3.73, before receiving the Base Payment. The Parties agreed to accept the Consent Form, but the claim is not included in the Mills Declaration or the calculations within this Joint Motion.

The Settlement Administrator also received eight requests for exclusion from the settlement, and all were submitted with a postmark on or before the Opt-In Deadline. (*Id.* ¶ 17.) The Settlement Administrator received zero objections to the settlement. (*Id.* ¶ 18.)

### D.    The Updated Calculation of the Individual Settlement Payments

The amounts of the Individual Settlement Payments were updated after receiving data from the Settlement Administrator regarding which Potential Opt-In Plaintiffs submitted a Consent Form to become an Opt-In Plaintiff. (Ex. 2, Niederberger Decl. ¶ 5.) The Allocation Formula explained above was used, except that the Individual Settlement Payments increased for two reasons, pursuant to the terms of the Amended Settlement Agreement. (*See id.*)

First, the remaining funds in the Base Settlement Amount were used to adjust each Opt-In Plaintiff's Base Payment upwards from $10.00 to $25.00 per Opt-In Plaintiff. (*Id*; *see* Agreement ¶ 7.2(a).) Second, after each Opt-In Plaintiff was allocated a $25.00 Base Payment, there were still remaining funds in the Base Settlement Amount, so the remainder was divided into two parts, for the Store Manager Collective and Non-Manager Collective, in accordance with the proportional relationship between the Manager Maximum Settlement Amount and the Non-Manager Maximum Settlement Amount. (Ex. 2, Niederberger Decl. ¶ 5; *see* Agreement ¶ 7.2(a).) Each Opt-In Plaintiff's Individual Settlement Payment was increased by an amount consisting of the Opt-In Plaintiff's Pro Rata Share multiplied by the Manager or Non-Manager portion of the remaining Base Settlement Amount, whichever is applicable. (Ex. 2, Niederberger Decl. ¶ 5; *see* Agreement ¶ 7.2(a).) The chart below explains the distribution of the Total Maximum Settlement Amount of $1,400,576.40 (which figure does not include Service Awards, Plaintiffs' Attorneys' Fees and Expenses, or the Administration Fee):

| Total Maximum Settlement Amount Distribution | | |
|---|---|---|
| | **Agreed Maximum Amounts**<br>(Pre-Notice, assuming 21,354 Opt-In Plaintiffs and 2 Named Plaintiffs) | **Actual Amounts to Be Paid**<br>(Post-Notice, 3,804 Opt-In Plaintiffs and 2 Named Plaintiffs) |
| Base Settlement Amount | $213,560.00 | $130,066.63 |
| Manager Maximum Settlement Amount | $759,328.32 | $259,718.43 |
| Non-Manager Maximum Settlement Amount | $427,688.08 | $90,307.87[7] |
| **Total** | **$1,400,576.40** | **$480,092.93** |

### E.     The Key Remaining Deadlines and Settlement Terms

After filing this Joint Motion, pursuant to the Preliminary Approval Order, the Parties will file all Consent Forms with the Court by June 18, 2021, which is within 60 days of the Opt-In Deadline.  If the Court grants this Joint Motion, the remaining key deadlines will be triggered:

- Upon the Final Approval Order, the General Release that is applicable only to the Named Plaintiffs will become effective.  (Agreement ¶ 8.1.)

- Upon the Final Approval Order and entry of the Agreed Order of Dismissal, the Opt-In Plaintiffs will release the Released Parties from the Released Claims.  (Agreement ¶ 8.2.)

- Within 10 days of the Final Approval Order, if the Court approves the Service Awards, Victra will distribute the Service Awards to counsel for the Named Plaintiffs in the form of a check made payable to the Named Plaintiffs.  (Agreement ¶ 7.3.)

- Within 10 days of the Final Approval Order, or the order awarding Attorneys' Fees and Expenses, whichever is later, the amount of Attorneys' Fees and Expenses that are approved by the Court shall be paid by wire transfer from Victra to Plaintiffs' counsel.[8] (Agreement ¶ 7.5.)

---

[7]  The actual amounts to be paid out of the Manager Maximum Amount and Non-Manager Maximum Amount equal the Claimed Settlement Amount.  No portion of the Claimed Settlement Amount shall revert to Victra.  (Agreement ¶ 5.3.)  If any Opt-In Plaintiff does not cash the check distributed to him or her by the Check Deposit Deadline, and there is no request by such Opt-In Plaintiff for a new check within 30 days after such check was issued, the monetary amount allocated to all such Opt-In Plaintiffs (the "Cy Pres Amount"), shall be donated by Victra to the nonprofit charitable organization identified by Victra in this Joint Motion, which is the VNation Disaster Relief Fund, as provided in Section I.E, *infra*.  (*Id.* ¶ 10.2.)

[8]  If any portion of the maximum $442,250.00 for Attorneys' Fees and Expenses is not approved by the Court, such Unapproved Fee Amount shall be divided into two parts, for the Store Manager Collective and Non-Manager Collective, and distributed in accordance with the proportional

- As directed in the Final Approval Order, or within 10 business days after the later of the entry of the Final Approval Order or last order from the Court deciding outstanding issues related to the settlement, Victra will fund the Qualified Settlement Fund. (Agreement ¶ 5.3.)

- After all of Victra's Tax Obligations have been paid and the Check Deposit Deadline has passed, the Settlement Administrator shall redistribute the Cy Pres Amount for donation to the nonprofit charitable organization identified by Victra in this Joint Motion, which is the VNation Disaster Relief Fund, as further explained below.  (Agreement ¶¶ 5.3, 10.2.)

The Amended Settlement Agreement provides that the Cy Pres Amount "shall be donated by Victra to a nonprofit charitable organization to be identified by Victra in the Parties' request to enter the Final Approval Order."  (Agreement ¶ 10.2.)  Accordingly, Victra now identifies the VNation Disaster Relief Fund, which is a 501(c)(3) organization whose purpose is to provide short-term assistance to employees of Victra who are facing severe financial hardship and are unable to afford housing, utilities, food, clothing, and other basic living expenses because of a natural disaster or other catastrophic circumstances beyond their control.

## II.  ARGUMENT AND AUTHORITIES

### A.  Standard for Approval of FLSA Collective Action Settlements

FLSA claims brought by an employee against an employer under 29 U.S.C. § 216(b) can be settled and released if the parties present the district court with a proposed settlement, and the court enters a stipulated judgment approving the fairness of the settlement.  *See Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982).  In reviewing a settlement of a private FLSA claim, the Court must scrutinize the proposed settlement for fairness and determine whether the settlement is a "fair and reasonable resolution of a bona fide dispute over FLSA provisions."  *Id.* at 1355; *see also Doe 1-2 v. Deja Vu Servs., Inc.*, No. 2:16-CV-10877, 2017 WL 2629101, at *8 (E.D. Mich. June 19, 2017), *aff'd sub nom. Does 1-2 v. Deja Vu Servs., Inc.*, 925

_____

relationship between the Manager Maximum Settlement Amount and the Non-Manager Maximum Settlement Amount.  (Agreement ¶ 7.5.)

F.3d 886 (6th Cir. 2019). A settlement that "reflect[s] a reasonable compromise over issues, such as FLSA coverage or computation of back wages[] that are actually in dispute" meets this test of resolving a "bona fide dispute." *Lynn's Food Stores*, 679 F.2d at 1354.

**B.    The Parties' Settlement Is a Fair and Reasonable Resolution of a *Bona Fide* FLSA Dispute**

### 1.    *A Bona Fide Dispute Exists*

The first requirement for court approval of an FLSA settlement has been met because the Court already ruled in the Preliminary Approval Order, based on the Parties' extensive arguments in the Preliminary Approval Motion (*see* ECF No. 71 at 9–12), that a *bona fide* dispute exists: there are "legitimate questions about the existence and extent of Victra's FLSA liability" and "a legitimate question about Plaintiffs' ability to proceed as a collective in the absence of a settlement because there are arbitration agreements between Victra and the potential collective members." (ECF No. 94 at 32–34.) As the Court recognized, "the risk of arbitration if the potential collective were to proceed without the settlement is not hypothetical" in light of the decision in *Duplechain v. ABC Phones of North Carolina, Inc.*, No. 20-287-JWD-SDJ (M.D. La. Oct. 23, 2020) (ECF No. 57) (compelling arbitration based on substantially similar arbitration agreements). (ECF No. 94 at 33–34.) The Court's findings in the Preliminary Approval Order remain true and support granting the Joint Motion.

### 2.    *The Amended Settlement Agreement Is Fair and Reasonable*

The second requirement is met because the Amended Settlement Agreement is fair and reasonable, as the Court ruled in its Preliminary Approval Order (ECF No. 94 at 34–39). In determining whether an FLSA settlement is fair and reasonable, the following factors are relevant: (1) "the likelihood of plaintiff's success on the merits," (2) "the risk of fraud or collusion behind the settlement," (3) "the complexity, expense, and likely duration of the litigation," (4) "the amount

of discovery completed," and (5) "the public interest in settlement." *See Fitzgerald v. P.L. Mktg., Inc.*, No. 2:17-CV-02251-SHM-cgc, 2020 WL 3621250, at *6 (W.D. Tenn. July 2, 2020) (Mays, J.). The Parties' arguments in the Preliminary Approval Motion, along with the Court's findings in the Preliminary Approval Order, remain true for final approval, as outlined below:

### a.  Likelihood of Success on the Merits

The likelihood of Plaintiffs' success on the merits—the most important factor[9]—favors finally approving the Amended Settlement Agreement, as the Court ruled in the Preliminary Approval Order, because Plaintiffs face "significant hurdles to recovery of substantial damages." (ECF No. 94 at 35–36.) As the Parties detailed in the Preliminary Approval Motion (ECF No. 71 at 15–24), the Total Maximum Settlement Amount is fair and reasonable in light of the significant hurdles to recovery, most notably the challenges in securing conditional and final certification due to the arbitration agreements and issues with establishing that the putative collective is "similarly situated," and the estimated potential damages amounts.

More specifically, Victra disputes Plaintiffs' ability to establish with legally competent evidence that the putative members of the collective were all subject to a single unlawful decision, policy, or plan so as to be "similarly situated."[10] Victra also asserts that the arbitration agreements with collective and class action waivers executed by Plaintiffs, as well as putative members of the collective are enforceable, and as such, at a minimum, each Plaintiff should be compelled to individual arbitration. Plaintiffs are aware that absent the Conditional Certification Stipulated

---

[9] ECF No. 94 at 20 (citing *Does* 1-2, 925 F.3d at 895) (stating likelihood of success on the merits is most important factor).

[10] *See, e.g.*, *Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 961 (W.D. Mich. 2009) ("[C]ourts have consistently required the plaintiffs to show that the class members were together the victims of 'a single decision, policy, or plan' before they will certify a collective action.") (citing cases).

Motion, they may never be able to maintain a collective (or class) of any kind comprised of individuals covered by enforceable arbitration agreements with class and collective action waivers. For the following reasons, and as further detailed in the Parties' Preliminary Approval Motion (ECF No. 71 at 15–24), it is Victra's position that its policies and practices undercut Plaintiffs' ability to secure and thereafter maintain certification of their putative collective action.

*First*, as explained in the Preliminary Approval Motion and supported by the Declaration of Kate Harris (ECF No. 71-2), Victra's position is that off-the-clock work is strictly prohibited and that its policies support that position. In addition, Victra explained that employees are responsible for the accuracy of their time records and are empowered to make any required modifications. Furthermore, any deviation from Victra's otherwise lawful practices would be due to a rogue supervisor.

*Second*, the Total Maximum Settlement Amount is reasonable in light of the theoretical maximum damages that could be awarded at trial. The average recovery from the settlement is $126.14, with a minimum recovery of $25.00 and a maximum recovery of $1,088.42. The chart below shows how the average recovery differs between the Non-Manager Collective and Store Manager Collective and how the actual Individual Settlement Payments to be made are much higher than the amounts that the Parties estimated in their Preliminary Approval Motion:

| Average Individual Settlement Payments Higher Than Originally Estimated | | |
|---|---|---|
| **Portion of Collective** | **Average Estimated Payments** | **Actual Amounts to Be Paid** |
| Across Entire Collective | $65.58 | $126.14 |
| Both Store Manager & Non-Manager Collective | $225.97 | $287.95 |
| Store Manager Collective | $168.59 | $366.17 |
| Non-Manager Collective | $15.48 | $52.03 |

The difference in average recovery among the Non-Manager Collective and the Store Manager Collective is fair and reasonable. On average, putative members of the Store Manager

Collective have much longer tenures as employees of Victra than putative members of the Non-Manager Collective, and work longer hours.  For instance, over 66% of the putative members of the Store Manager Collective work over a year for Victra, and over 40% work more than two years for Victra.  In sharp contrast, over 25% of members of the Non-Manager Collective work less than 3 months, and almost half of the members of the Non-Manager Collective work less than 6 months.  Moreover, putative members of the Store Manager Collective on average work over 5 more hours a week than putative members of the Non-Manager Collective.  These amounts represent a fair and reasonable settlement of highly disputed claims, particularly in light of the arbitration agreements and the other hurdles to recovery described in detail in the Parties' Preliminary Approval Motion.  (*See* ECF No. 71 at 18–21.)

*Third*, the calculation of Individual Settlement Payments under the Amended Settlement Agreement was revised to provide further compensation to Opt-In Plaintiffs.  In revising the settlement and seeking to follow the guidance from this Court's Initial Settlement Order, the Parties carefully reevaluated the calculation of Potential Opt-In Plaintiffs' Individual Settlement Payments to analyze the distribution across the Collective.  In this process, the Parties determined that the original allocation formula could be construed as overcompensating some and undercompensating others because it provided the same amount of compensation to Potential Opt-In Plaintiffs so long as the employee worked at least five days in a week, regardless of whether the employee worked a five-day, six-day, or seven-day workweek.  To eliminate these issues, the Parties decided that Potential Opt-In Plaintiffs' should receive compensation even if they worked only four days in a week (since it was possible, although remote, that such employee could have potentially worked overtime in such period of time), and should receive more compensation depending if they worked four, five, six, or seven days in a week (as the possibility of an employee

working overtime increases the more days per week they work). (*See* Agreement ¶ 7.2.) The Parties agreed that this metric better correlates to the likelihood that an employee would have worked overtime hours that, under Plaintiffs' allegations and theories of recovery, were allegedly undercompensated either due to an alleged miscalculation or off-the-clock work.

Additionally, the Parties, recognizing the time and effort required of each Opt-In Plaintiff to opt in, as well as the fact that compensation for alleged off-the-clock work is impracticable to estimate, also agreed to provide all Opt-In Plaintiffs with a Base Payment. Despite the fact that Victra strongly contends that estimated trial damages due to off-the-clock work would be non-existent (or, at best, *de minimis*) given Victra's policies and the ability of employees to edit their timesheets, Victra agreed to increase the amount of money offered in the settlement, so that every Opt-In Plaintiff will receive a Base Payment of $25.

**Fourth**, in light of the reasonableness of the Total Maximum Settlement Amount and the Individual Settlement Payments, the reversionary provisions of the Amended Settlement Agreement are reasonable. The Initial Settlement Order expressed potential concern regarding the reversionary provisions governing unclaimed settlement funds. On these points, the Parties respectfully submit that the calculation of the Individual Settlement Payments as set forth in Paragraphs 7.1 through 7.5 is reasonable, and that all approximately $1.4 million should not be guaranteed to be paid to the Collective regardless of how many individuals opt in. This is a fair and reasonable procedure in this collective action where, unlike in an opt-out class action, Potential Opt-In Plaintiffs who do not specifically choose to opt in to the settlement will retain their claims and not be subject to any form of a release. There was tremendous uncertainty about the number of Potential Opt-In Plaintiffs who would choose to join the Collective, and it would not be fair or reasonable for a few number of Opt-In Plaintiffs to split a large settlement amount negotiated and

designed to compensate over 20,000 individuals. Indeed, counsel for Potential Opt-In Plaintiffs

represented in related lawsuits has indicated that many Potential Opt-In Plaintiffs will not join the

Collective, *see, e.g.*, Memorandum of Law in Support of James Baggott's Motion to Intervene

(ECF No. 40 at 11), and, as a result, the Claimed Settlement Amount set forth in Paragraph 5.3 is

calculated based on the actual number of Opt-In Plaintiffs to maintain proportionality between the

number of Opt-In Plaintiffs and the Individual Settlement Payments for those collective action

members.[11] Notably, despite the fact that the opt-in rate was about 17%, about 34% of the Total

Maximum Settlement Amount is being paid. Moreover, the Parties agree that the Amended

Settlement Agreement represents a negotiated compromise to resolve this dispute, without either

party having conceded their position on the merits and without there having been any finding of

wrongdoing by any Party.

### b.    <u>No Fraud or Collusion</u>

As the Court ruled in the Preliminary Approval Order, and as the Parties explained in the

Preliminary Approval Motion, there is no evidence of, nor was there any, fraud or collusion

between counsel with regard to the Amended Settlement Agreement. (*See* ECF No. 94 at 36–37.)

This settlement was reached as a result of arms-lengths negotiations and a mediation conducted by

a neutral third-party mediator, Michael Russell, between the Parties through experienced wage and

hour attorneys. *Cf. Schneider v. Goodyear Tire & Rubber Co.*, No. 5:13-2741, 2014 WL 2579637,

at *2 (N.D. Ohio June 9, 2014) (considering the risk of fraud or collusion between the parties in

---

[11] FLSA settlements allowing for reversion of unclaimed settlement amounts to revert back to defendants are routinely approved by courts across the country, including in the Western District of Tennessee. *See, e.g.*, *Robbins v. Flowers Foods, Inc.*, No 1:19-cv-01021 (W.D. Tenn. Feb. 27, 2019), ECF No. 23 (approving reversionary settlement fund); *Warren v. Cook Sales, Inc.*, No. CV 15-0603-WS-M, 2017 WL 325829, at *4, *8 n.11 (S.D. Ala. Jan. 23, 2017); *Pliego v. Los Arcos Mexican Rests., Inc.*, 313 F.R.D. 117, 122 (D. Colo. 2016).

determining whether to approve an FLSA settlement and concluding that because the parties had engaged in court-supervised negotiations, there was no such risk).

During the litigation and settlement of this action, Plaintiffs were represented by counsel both respected in the community and experienced in handling wage and hour collective actions. Plaintiffs' counsel have the experience to assess the risks of continued litigation and benefits of settlement and have done so in this action. Plaintiffs' counsel represents employees with claims against employers similar to the claims asserted in this case. Defense counsel is likewise experienced in defending similar claims. Counsel for both Parties have advised their respective clients regarding the settlement, and they have recommended judicial approval. Those recommendations, the Parties respectfully submit, should be afforded some weight. *See Lynn's Food Stores*, 679 F.2d at 1354 (recognizing that courts rely on the adversary nature of a litigated FLSA case resulting in settlement as an indication of fairness).

### c.        Complexity, Expense, and Likely Duration of the Litigation

The complexity, expense, and likely duration of the litigation favor finally approving the Amended Settlement Agreement because the litigation presents difficult legal questions, as the Court ruled in the Preliminary Approval Order. (ECF No. 94 at 37–38.) The complexity, expense, and likely duration of the litigation should a settlement not have been reached weighs heavily in favor of finding that this settlement is fair and reasonable. Without question, if the case does not settle, the Parties will have to spend significant time and resources, whether in litigation or arbitration, completing discovery, including written discovery and depositions of various Plaintiffs, putative members of the collective, and Victra's upper management witnesses. After the resolution of these issues, the Parties would have faced the prospect of expensive, lengthy individual arbitrations. Rather than take this path, the Parties directed their efforts toward an early, informed, efficient resolution of Plaintiffs' claims. Preparation for the Parties' mediation session

enabled counsel to assess the respective strengths and weaknesses of their case and reach the conclusion that settlement is in the Parties' best interest.

### d.    Discovery Completed

The amount of discovery completed favors finally approving the Amended Settlement Agreement, as the Court ruled in the Preliminary Approval Order.  (ECF No. 94 at 38.)  Victra produced substantial informal discovery, in the form of over 400,000 payroll records containing 24 variables related to the Named Plaintiffs and putative members of the collective, which was sufficient to develop the Parties' understanding of potential claims and defenses to satisfy this factor.  (*See id.* (citing *Does 1-2*, 925 F.3d at 898–99).)

### e.    Public Interest in Settlement

There is public interest in finally approving the Amended Settlement Agreement because public policy favors settlement of collective actions, as the Court ruled in the Preliminary Approval Order (ECF No. 94 at 38–39).  *See, e.g.*, *Fitzgerald*, 2020 WL 3621250, at \*6 ("Public policy favors settlement of collective actions.").

### C.    Final FLSA Certification

Lastly, because the Parties desire to finally conclude their settlement, the Parties respectfully request that, for settlement purposes only, the Court finally certify the collective that the Court conditionally certified in the Conditional Certification Order.

## III.    CONCLUSION

Accordingly, the Parties respectfully request that the Court grant the Joint Motion, finally approve the Parties' Amended Settlement Agreement, and finally certify the collective that the Court conditionally certified in the Conditional Certification Order.

Respectfully submitted, this, the 11th day of June, 2021.

*s/ J. Russ Bryant*
Gordon E. Jackson (TN BPR #08323)
J. Russ Bryant (TN BPR #33830)
Robert E. Turner, IV (TN BPR #35364)
Nathaniel A. Bishop (TN BPR #35944)
Robert E. Morelli, III (TN BPR #37004)
B. Alan Matthews (TN BPR #37828)
**JACKSON, SHIELDS, YEISER, HOLT,**
**OWEN & BRYANT**
Attorneys at Law
262 German Oak Drive
Memphis, Tennessee 38018
Tel: (901) 754-8001
Fax: (901) 759-1745
*gjackson@jsyc.com*
*rbryant@jsyc.com*
*rturner@jsyc.com*
*nbishop@jsyc.com*
*rmorelli@jsyc.com*
*amatthews@jsyc.com*

*ATTORNEYS FOR THE NAMED*
*PLAINTIFFS AND OPT-INS*

**ANGELA C. ZAMBRANO**
Texas Bar No. 24003157
*Pro Hac Vice*
angela.zambrano@sidley.com
**MARGARET HOPE ALLEN**
Texas Bar No. 24045397
*Pro Hac Vice*
margaret.allen@sidley.com
**NATALI WYSON**
Texas Bar No. 24088689
*Pro Hac Vice*
nwyson@sidley.com
**TAYLER G. BRAGG**
Texas Bar No. 24109943
*Pro Hac Vice*
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
(214) 981-3300 – telephone

*s/ Zachary B. Busey*
**ZACHARY B. BUSEY**
Tennessee Bar No. 29763
zbusey@bakerdonelson.com
BAKER, DONELSON, BEARMAN
CALDWELL & BERKOWITZ, P.C.
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
(901) 577-8164 – telephone

**JENNA M. BEDSOLE**
Alabama Bar No. 4603-N74J
*Pro Hac Vice*
jbedsole@bakerdonelson.com
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
420 Twentieth Street North, Suite 1400
Birmingham, Alabama 35203
(205) 328-0480 – telephone

*ATTORNEYS FOR DEFENDANT*

### CERTIFICATE OF SERVICE

I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which sent notification of the filing to all counsel of record.

So certified, this, the 11th day of June, 2021.

*s/ Zachary B. Busey*

**ZACHARY B. BUSEY**